# Richmond

## Mary Eppes v. Mary Van Deusen Eppes, Executrix, Etc., et als.

October 11, 1943.

Record No. 2704.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*J. Gordon Bohannan* and *Bernard C. Syme*, for the appellant.

*E. D. Lucas*, for the appellees.

SPRATLEY, J., delivered the opinion of the court.

These proceedings are a sequel to the case of *Eppes* v. *Eppes*, 169 Va. 778, 195 S. E. 694, decided January 13, 1938.

The present appeal is based upon alleged errors in a decree of November 14, 1942, which overruled and sustained certain exceptions filed by the appellant and the appellees to the report of a commissioner in chancery nominated and appointed in the decree heretofore appealed from.

The early history of the case is recited in the opinion on the first appeal. We will here undertake only to connect it with subsequent events, facts, and proceedings.

Mary Van Deusen Eppes, executrix of Richard Eppes, deceased, her late husband, and in her own right, instituted these proceedings on July 16, 1930, to require an accounting of all partnership transactions by and between Richard Eppes and Mary and Josephine Eppes, a conveyance to the estate of Richard Eppes of certain lands in which he was alleged to have had an interest at the time of his death, and the payment by Mary Eppes of certain sums of money alleged to have been received by her from property, real, personal, and mixed, in which the estate of Richard Eppes was entitled to share.

Voluminous depositions were taken, hundreds of exhibits were filed, and exhaustive oral and written arguments were presented. Subsequently, the then judge of the trial court, the late M. R. Peterson, entered a final decree on October 12, 1936, adjudicating, interpreting, and construing the rights of the parties, and referring the cause to David A. Harrison, a commissioner in chancery, for the purpose of making certain inquiries and taking accounts in order to arrive at the accurate and specific amounts to be awarded under its adjudication. At the same time, Judge Peterson, a learned and experienced chancellor, filed, and made a part of the record in the cause, a written opinion of fifty-six pages, the material conclusions of which were adopted by us in *Eppes* v. *Eppes, supra*.

After the death of Mrs. Mary Van Deusen Eppes in 1937, E. W. Tylar, executor of her estate, and E. W. Tylar, administrator d. b. n. of the estate of Richard Eppes, and other interested persons were admitted in the suit as parties plaintiff in the place and stead of Mrs. Eppes, and the cause thence proceeded in their names.

Commissioner Harrison, on April 6, 1938, began the taking of the accounts and the making of the inquiries referred to him. He concluded the hearing of the evidence on July 29, 1939, and filed his report on June 8, 1942. He heard the witnesses at length, and examined hundreds of pages of transcripts, vouchers, records, exhibits, and audits, covering a period of many years and involving many thousands of dollars.

The commissioner's report states that he proceeded upon the general theory that the relationship between Richard Eppes and his sisters, Mary and Josephine, originally was a partnership, as determined by Judge Peterson, and that it continued as such partnership after the death of Josephine with Mary Eppes entitled to a two-thirds interest and Richard to one-third. Richard being the manager of the business and the keeper of its records until his death on March 27, 1922, he charged him with the duty and liability of keeping such records correctly until that date. Mary Eppes, having thereafter taken over such management through her agents and servants, he charged her with the like burden and responsibility.

For the sake of brevity, we will summarize the several inquiries directed by the court and the respective findings of the commissioner, and for convenience and clarity we will set out the respective findings immediately after the statement of each inquiry.

(1) Under the adjudication that the estate of Richard Eppes was entitled to a one-third undivided interest in lands which, as of the 27th day of March, 1922, stood in the name of Mary Eppes or in the names of Josephine D. Eppes and Mary Eppes, lying within defined boundaries, the commissioner was directed to report a specific description of

the said lands, including all such parcels as may have been sold and thereafter repossessed by Mary Eppes, save and except certain lots divided between the parties in a deed of partition, dated December 31, 1924.

In answer, the commissioner listed and described the properties in accordance with an agreed stipulation between the parties.

(2) Under the adjudication that Mary Eppes should pay to the estate of Richard Eppes one-third of the price of any of such lots as may have been sold by her since March 27, 1922, with interest from the date of such sale or sales, less any *bona fide* commissions which she may have paid to an agent employed to sell such property, the commissioner was directed to report and state an account of the price at which such lots were sold, "less the value of such permanent improvements as may have been placed upon said property by her at her own charge, since the said date," provided that the value of such improvements should not be taken, "in whatsoever form they may have been made by her, to diminish the original value" of such land as ascertained at the date of the sale thereof. The account was to include the value of the lots before such improvements, if any were made, and their value afterwards.

In accordance with the stipulation between the parties, the sale prices of the land sold between March 27, 1922, and January 21, 1938, not including the sale of franchises, amounted to $105,850, and the commissions paid in connection with the sales $4,000, leaving a balance of $101,850 as the sale price of the land. No improvements were reported as having been made "upon" these lands by Mary Eppes, "at her own charge," by virtue of the construction the commissioner placed upon the language of the court in the directive. He construed the word "upon" in the phrase "permanent improvements as may have been placed upon the said property" as "contemplating buildings, structures, or some form of improvement located actually upon the property." He did not consider pavements, curbs, and

gutters placed upon the streets adjoining the property as being improvements upon the property itself.

(3) Under the adjudication that the estate of Richard Eppes was entitled to one-third of all the rents, issues, and profits derived from any part of the land remaining unsold at the death of Richard Eppes, with interest thereon from the date of their receipt by her, "less one-third of the amount of any taxes, costs of necessary repairs," and the *bona fide* costs of the collection of such rents, issues, and profits," the commissioner was directed to set forth the specific items deductible and to ascertain the net amount for division.

The rents, issues, and profits were stated at $131,604.49, of which one-third, that is, the sum of $43,868.16, was found to accrue to the estate of Richard Eppes, less deductions for taxes amounting to $3,202.70, fire insurance $790.08, and expenses for collection of rents, etc., $2,193.41.

Although it was admitted repairs had been made to buildings situated on the premises by Mary Eppes during the years 1923 to 1937, inclusive, and the sum of $4,331.88, one-third of their cost, was charged on the books and the audits against the estate of Richard Eppes, no allowance therefor was made. The commissioner was of opinion that the evidence did not prove that the repairs were required in the sense the word "necessary" was used by the court.

Other items of expense, in the operation of the partnership property, claimed by Mary Eppes, were disallowed by the commissioner on the grounds either that the language of the decree did not embrace them or because he was unable from the evidence to separate and allocate them from expenses incurred by her in the management of her individual properties.

(4) Under inquiry number 4, the commissioner valued the personal property belonging to the partnership, according to an audit of "Richard Eppes' Agent Account" as of March 27, 1922, at $86,361.62. He reported that some of the items comprising the total had subsequently become of negligible value and others had been settled between the

parties. Included in this valuation were notes receivable in the sum of $28,553.17, which were not collectible, notes collected, whose proceeds had been divided between the parties, and $19,144.88, the cost of certain buildings erected on Main street property, which property, with the improvements thereon, is being divided in the course of this suit. Included also was an overdraft of Richard Eppes for $7,957.11, which is specifically referred to in inquiry number 10. The tangible personal property was not charged with any earned increment; but interest was allowed as specified upon several notes in which the estate of Richard Eppes was entitled to share.

(5) Under inquiry number 5, he reported that all proceeds from the sale of franchises or rights-of-way had been accounted for, being treated as sales of real estate and included in the sale prices thereof.

(6) The sixth inquiry directed the commissioner to inquire and state an account of any expenditure made by Mary Eppes upon property of the partnership sold by her and thereafter repurchased by her, whether before or after March 27, 1922, "in the permanent improvements thereof, if any such there were," made "out of her own privy purse, such as may have enhanced the value of such parcel of land, beyond its original value," provided that the value of such improvements should not be allowed to diminish the value of the premises as such values existed before such improvements were made after her repurchase of the lots. There was to be stated a description of the property and its value before and after the improvements were made.

The commissioner reported that no permanent improvements had been made by Mary Eppes "upon" lots sold and repossessed, in the sense in which the word "upon" was used by the trial court. He refused to consider improvements upon other unsold lots.

He stated, however, that if he had been directed to report expenditures "which enhanced the value of the premises referred to, the situation would be different and your Commissioner's answer would be different, for there is evidence

to show that Mary Eppes used a part of her funds or estate (separate and distinct from the properties in which the Richard Eppes' estate has been adjudged to have an interest) for the purpose of enhancing the value of such premises, and such use did result in enhancing the value of such premises." In this connection, he referred to a contract made February 1, 1928, between Mary Eppes and the city of Hopewell, whereunder the city put a hard surface pavement on Commerce street, one of the streets upon which the partnership property abutted, paved the sidewalks, and constructed curbs and gutters at a cost of $20,000, and wherein Mary Eppes agreed to convey to the city in consideration therefor a parcel of her individual real estate, which had a value of $20,000 at that time. The commissioner found that the lands of the partnership upon Commerce street were enhanced in value to the extent of $20,000.

(7) The next inquiry directed the commissioner to "state an account of all lots or parcels of land comprised within the area wherein the estate of the said Richard Eppes has been adjudged to be vested with a one-third (1/3) undivided interest which were heretofore purchased by the said Richard Eppes in his lifetime in his own name from Richard Eppes, Agent, as appearing in the 'Richard Eppes' Agent Account,' as noted in the said Report of the audit herein, in order that his estate may be held to account for such of said lots, if not heretofore accounted for, as may have been sold by him, at the price at which they were thus sold by him respectively, setting forth the prices at which such lots may have been sold by him, and, at all events, stating the fair market value thereof whether sold, or unsold by him, at the time of his purchase thereof, and setting forth a description of such lots."

Accordingly the commissioner reported and described a number of lots which Richard Eppes, in his lifetime, purchased in his own name for $5,785 from Richard Eppes, agent, and which he subsequently sold between May 7, 1915, and September 21, 1915, at a net profit of $16,375.16. The

account states the respective purchase and resale prices of each of the said lots and dates of sales.

(8) Under the adjudication that a two-thirds undivided interest in the Pecan avenue property, as of the date of the death of Richard Eppes, be "charged with liability to the estate of Richard Eppes for an amount equivalent to one-third of the amount evidenced by" a check for $31,976, with interest thereon from January 6, 1916, the commissioner was directed to describe said property and state the value of such two-thirds interest as of March 27, 1922. In stating the value of the property, he was requested to "specifically find the value of any improvements, if any such there were, which may have been made upon the premises by the said Mary Eppes or Josephine D. Eppes, after their undertaking to convey their interest therein to the said Richard Eppes, as aforesaid, and the purpose, and occasion, of the said improvements, and their effect upon the value of such premises, provided, however, that the value of such improvements shall not be deemed or allowed by said commissioner to diminish the value of said property as existing in its original form, that is, before the said improvements were made and as its value appeared at the time of the undertaking of the respondent (Mary Eppes) and her sister to convey their said interest therein to the said Richard Eppes as aforesaid."

The commissioner described the property and gave its area as 1¼ acres more or less. He stated its entire valuation, as of March 27, 1922, the date of the death of Richard Eppes, to be $9,900, and consequently a two-thirds interest to be worth $6,600. He reported that considerable improvements were made to the building thereon in 1916, by Mary Eppes and her sister to put it in condition for its occupancy by Richard Eppes and his family; that these improvements cost $9,600; and that the premises had a value of about $15,000 in 1926. He further found that the old building was in such a dilapidated condition that it had very little value prior to the above improvements, and that the improvements were made by the Misses Eppes in furtherance of their agreement to convey their two-thirds interest in

the property to Richard Eppes, who already owned one-third. He estimated the effect of the improvements was to enhance the value of the property by approximately $8,000.

(9) In response to the inquiry whether the sum of $10,858.34, reported in an audit under the title of "City Point Expenses" and therein noted as paid out of the funds of Richard Eppes' Agent Account," was a proper charge against the partnership or whether it should be charged against Mary Eppes, the commissioner reported that the sum was a proper charge against the partnership. He based his conclusion upon the evidence of two of the auditors in the case, and upon the records of the entry of the several items comprised in the total sum as debits against the partnership in the books of the partnership kept by Richard Eppes, during his lifetime and while he was in charge of the operations of the partnership business. He treated the latter fact as an admission against the interest of Richard because he was familiar with the partnership affairs, personally interested in its financial condition, and without a share in the individual business of his two sisters.

(10) The commissioner found that the overdraft of $7,957.11 was not a proper charge against the estate of Richard Eppes, in that it was discharged in an accounting had between the parties as of March 31, 1920.

(11) Under the last inquiry, the commissioner listed the lands embraced in the partition deed of December 31, 1921, between the parties, and reported that no lots had been overlooked or pretermitted in the partition.

Exceptions were filed by the appellant to the report of the commissioner under inquiries 2, 3, 4, 6, 8, and 10, and by the appellees to 3, 7, 8, and 9. The commissioner's report and the exceptions thereto came on to be heard on November 14, 1942, before Judge Robert W. Arnold, now deceased. In the decree entered on that date, the decree here appealed from, the learned chancellor ruled upon the report as follows:

(1) Sustained and confirmed the commissioner's findings responsive to inquiry number 1, and directed Mary Eppes to

forthwith convey to the executor of Richard Eppes' estate an undivided one-third interest in the property therein listed and described.

(2) After amending the report under inquiry number 2, so as to allow credit of $28,553.17 for uncollectible notes, originally secured on lots sold and thereafter repossessed, and now included in the lands to be divided between the parties, sustained the findings of the commissioner, and directed Mary Eppes to pay the estate of Richard Eppes $24,432.27, with interest as specified.

(3) Sustained the report under inquiry 3, after correcting an error of the commissioner, whereby Richard Eppes was charged with $790.08 for fire insurance premiums instead of $2,370.24, and with $3,202.70 for taxes instead of $9,608.09, the larger amounts being the correct sums paid by Mary Eppes for insurance and taxes on the partnership property.

(4) Overruled all exceptions of Mary Eppes to inquiry 4, and confirmed the commissioner's report, after amending it so as to give her credit for two items, one of the value of $300 and the other of $260.

(5) and (6) Approved and confirmed the report as to inquiries 5 and 6, further decreeing that no further settlements were necessary thereunder.

(7) Disapproved the report of the commissioner as to the seventh inquiry, the court being of the opinion the evidence showed that all profits properly chargeable against Richard Eppes had been accounted for and settled in the agreement between the parties as of March 31, 1920.

(8) Without specifically passing upon the commissioner's findings under inquiry 8, gave a judgment against Mary Eppes in favor of Richard Eppes' estate for the sum of $10,658.66, one-third of the DuPont check of $31,976, with interest from January 6, 1916, and decreed that a specific equitable lien be impressed upon the undivided two-thirds interest of Mary Eppes in the Pecan avenue property, the net proceeds to apply to the payment of the judgment, the deficiency, if any, to be paid by Mary Eppes.

(9), (10), and (11) Approved and confirmed the report of the commissioner as to 9, 10, and 11.

The decree further ordered and directed that the settlement of receipts and disbursements of the partnership property from December 31, 1937, not included in the report, should be made in accordance with the adjudications and requirements therein expressed. It directed that Mary Eppes pay the cost of the proceeding, including the costs expended by the estate of Richard Eppes. The trial court did not pass upon the allowance of a fee of $2,500 asked by Commissioner Harrison for his services nor upon a charge of $675 by E. W. Tylar for auditing the accounts of the partnership for the use of the commissioner.

We are thus brought to a consideration of the numerous assignments of error and cross-error to the above decree. The appellant contends that the trial court erred in overruling her exceptions to the report of the commissioner under inquiries 2, 3, 4, 6, 8, and 10, in sustaining the exceptions of the appellees to the report under inquiry 7, and in certain adjudications hereinafter referred to. The appellees assign cross-error to the allowance of $28,553.17 to Mary Eppes for uncollectible notes, under inquiry 2; to the refusal of credit to the estate for notes receivable, listed under number 4; to the allowance of $10,858.34 against the partnership under inquiry 9; to the failure to allow the estate credit for an interest in $19,000 alleged to be "miscellaneous cash" received by Mary Eppes for the partnership; for failure to charge Mary Eppes rent for partnership property used as an office for partnership business and for her personal affairs; and to the admission of incompetent, irrelevant, and improper evidence before the commissioner.

No new principles of law are involved in this appeal. The 1936 decree of Judge Peterson was intended to be, and was, final, complete, and binding on all the principles and issues presented. It left for future proceedings only the ascertainment of certain facts and figures to complete an accounting between the parties, and the administration of the details therein contained, and those subsequently to be estab-

lished under the finding of the commissioner. The parties admit its conclusiveness otherwise, although some of their contentions are in conflict with that admission.

A review of the record on the first appeal and our examination of the present record strengthen our conclusion that the rights and principles enunciated in the opinion of Judge Peterson were correct and proper, and that the decree based thereon was without error.

In controversy here is the proper construction of some of the language of Judge Peterson's decree, and the correctness of the facts found and principles applied in the later decree of Judge Arnold. In the main, however, the case presents questions of the sufficiency of evidence and a vexatious problem in accounting,—questions and a problem made more difficult by the death of one of the partners and the multiplicity of transactions during the many years embraced in the period of the accounting.

We have often had occasion to state the weight of a report of a commissioner in chancery. On questions of fact, it is deemed to be *prima facie* correct and entitled to great weight, although it does not bind the court like the verdict of a jury. Virginia Code, 1942, (Michie) section 6179.

The conclusions of a commissioner, where the evidence has been taken in his presence, should be sustained unless it plainly appears that they are contrary to the law, unsupported by the evidence, or not warranted by any reasonable view of the evidence. If the evidence is competent and substantial, the court does not have the arbitrary power to overturn the conclusions of fact based thereon. *Lohman* v. *Sherwood*, ante, page 594, 26 S. E. (2d) 74; *Roark* v. *Shelton*, 169 Va. 542, 194 S. E. 681, and cases cited. See extensive citation of cases in Volume 8, Digest of Virginia and West Virginia Reports, (Michie) "Reference and Commissioners," section 30, pages 563, *et seq.*

In view of the exceptions to the commissioner's report and the assignments of error, it is our duty to examine the evidence, review the conclusions of the commissioner and the trial court, and determine whether or not their respective

conclusions are supported by the evidence and sustained by the law.

The first assignment of error relates to the failure of the commissioner and the trial court, under inquiries 2 and 6, to allow the appellant credit for her expenditures for permanent improvements enhancing the value of the partnership lands, and to give her credit for certain other disbursements in connection with the management of such property.

■ The commissioner failed to deduct from the total sales a sum which was not collected and which the evidence clearly shows was not collectible. Notes amounting to $28,-553.17, representing a portion of the sale prices were secured by liens upon certain of the lots sold. For failure to pay the notes, the deeds of trust securing them were foreclosed and the properties therein described were repurchased and repossessed by Mary Eppes, one-third of which lots have been allotted in this proceeding to Richard Eppes' estate. The estate is not entitled to charge Mary Eppes also with the uncollectible money. The trial court accordingly corrected the commissioner's error by deducting the sum of the uncollectible notes from the total sale prices, leaving the estate of Richard Eppes entitled to a judgment for $24,-432.24, with the interest specified.

■ The commissioner did not make any allowance for improvements under inquiries 2 or 6, because of his construction of the language of the trial court, and because he deemed the improvements to be limited to those on property sold, or sold and repossessed, by Mary Eppes subsequent to March 27, 1922, as distinguished from property never sold. He erred, we think, in his strict and technical construction of such language. The picture must be viewed as a whole, having in mind that the intent and purpose of the reference was to ascertain the debits and credits between the parties on account of all of their respective transactions in connection with and for the benefit of the entire partnership property and business.

Mary Eppes originally owned the entire property, consisting of undeveloped and unimproved tracts of land. This

property, in accordance with the contract between Mary, Josephine, and Richard Eppes, was subdivided into town lots, with streets, lanes and alleys. Such improvements as were made to and upon the several subdivisions, as entireties, should not be eliminated because they were not actually made upon specifically identified lots or parcels of land included in a subdivision.

The word "improvement" is a comprehensive term, which includes in its meaning any development whereunder work is done and money expended with reference to the future benefit or enrichment of the premises. *Cullop* v. *Leonard*, 97 Va. 256, 33 S. E. 611; Volume 4, Words and Phrases, First Series, pages 3454, *et seq.*

No special emphasis should be placed on the word "upon." In a broad and liberal sense, the clause in which it is used includes permanent improvements made to or for the benefit of the property as a whole as well as those on specific premises. The inquiries did not limit the nature of the improvements to buildings and structures physically located upon the lots as distinguished from the tracts of land, or the easements or appurtenances appertaining thereto. Any improvements on, in, or under, the streets, or easements, for the betterment, use and enjoyment of the lots, separately, or the property as a whole, constituted the character of improvements contemplated by the court.

It is true that the inquiries do not specifically refer to lots never sold. The improvements claimed, however, inured as well to the benefit of all the lands, sold or unsold. The improvement of the streets and the construction of curbs and gutters thereon were essential to the development and sale of abutting lots. The estate of Richard Eppes shared, and shares, in the increase in value of all the lands in which it was interested, whether sold, sold and repossessed, or never sold. It received the benefit of the increased prices of lots sold, and it has been allotted one-third of the land remaining unsold.

In the February 1, 1928, contract of Mary Eppes with the city of Hopewell, she agreed to convey to the city a parcel

of her own property, separate and distinct from the partnership property, in consideration that the city would put a hard surface pavement on Commerce street from Main street to Hopewell street, pave its sidewalks, and construct curbs and gutters thereon. Accordingly, the city, in 1928, spent $20,000 in such work.

The evidence supports the commissioner in his findings that the property which Mary Eppes agreed to convey to the city had a value at that time of $20,000, and that the properties of the partnership, located on the improved street, were enhanced in value by approximately $20,000.

Some question is raised by the appellees about the full completion of the respective agreements of Mary Eppes and the city of Hopewell. That is a matter between the city and Mary Eppes. The partnership estate has received the benefit of the improvements, and it is to be presumed that the contract will be carried out.

There is no merit in the contention that the expenditure by Mary Eppes was not "out of her own privy purse." It was not intended that she should make an outlay of cash, or currency, from her personal pocketbook or financial depository. It is sufficient if the improvements were made at her personal charge and expense, either by an expenditure from her cash or by the transfer of her real and personal property of the same value. It is just and equitable that the estate of Richard Eppes should bear its proportion of the cost of such improvements as were made at the expense of Mary Eppes. Consequently, the estate should be charged with one-third of $20,000, that is, the sum of $6,666.67, with interest from February 1, 1928.

There is no real objection to the amendment of this report under inquiry 3, whereby the estate of Richard Eppes was charged by the court with $9,608.09 taxes and $2,370.24 insurance premiums, instead of the amounts allowed by the commissioner through an accounting error. The controversy hereunder relates to the refusal of the commissioner and the court to allow further expenses claimed to have been made for or on behalf of the joint account, the partnership.

Original invoices and entries on the books of Mary Eppes disclose that during the years 1923 to 1937, the sum of $12,-994.14 was spent in repairs on rented property owned by the partnership, of which $4,331.38 was charged to the estate of Richard Eppes. Also charged as the estate's proportion of other expenditures, during the same period, were the following items: $120 for water connection fees; $194.93 for liability shown on a former audit; $1,527.79 for buildings purchased within the territory involved; $278.35 for development expenses and cost of wrecking old buildings; $261.85 for water bills and sewer fees; $96.50 for maps and surveys; $10,878.11 for buildings constructed within the area involved; and $220.62 for miscellaneous expenses.

The disputed items are shown on exhibit "E. W. T. No. 20-B," prepared by E. W. Tylar, now fiduciary plaintiff. This exhibit is an analysis of the direct expenses wholly charged against the estate of Richard Eppes, some of which were identified by Tylar from his personal knowledge, and the remainder by him from the books and records of Mary Eppes, kept by R. C. Potts, her business agent. Potts testified that the expenditures were necessary and that they had been properly apportioned and allocated.

Tylar is an experienced public accountant. He had been employed as an auditor and accountant for Richard Eppes, his two sisters, Mrs. Mary Van Deusen Eppes, and the partnership from the year 1915. He audited the books of the partnership from the beginning, as well as the business accounts of the above individuals. He was thoroughly acquainted with the real estate of the partnership, its business and its accounts, and was, as Judge Peterson said, in many respects a common agent of the several parties.

Potts had been employed by the Eppes family since 1915, except for a short period from December 12, 1917, to August 1, 1919, when he was in the armed services of this country during the first world war. Since January, 1923, he has represented Mary Eppes as office manager and accountant. He kept the books and accounts of her business, or had them kept under his general supervision, and attended

to all construction and repairs of buildings, the rental of properties, and the collection of rents therefrom.

The commissioner recognized the above expenditures as having been made in connection with the partnership property and business, but disallowed them on the grounds stated. The trial court sustained the commissioner.

We think both the commissioner and the trial court erred. The repairs and the other items were for the purpose of providing rents and profits from an estate in which Richard Eppes had a one-third interest. In the ordinary course of nature, over a period of years, buildings and structures require repairs, especially buildings of the type involved. They were necessary if the property was to be preserved and made desirable for occupancy by tenants. The fact that the landlord expended money for such repairs, over a course of fifteen years, directs us to the irresistible conclusion that they were needed and, therefore, necessary.

When the court determined that one-third of the partnership property, standing in the name of Mary Eppes, belonged to the estate of Richard Eppes, his estate was burdened with one-third of the necessary expenses of servicing and administering such property. There were no net profits unless the income was greater than the necessary expenses. While construction costs might well have been considered and allowed as improvements under another inquiry herein, the effect is the same in whatever order they may be allowed. In fact, the clear, positive, and uncontradicted evidence is that the expenditures were made on behalf of the partnership property, and properly charged against it.

The trial court should have allowed Mary Eppes the amount represented by each of these expenditures, with interest thereon from the 31st day of December of each year in which they were severally made, as shown on exhibit "E. W. T. No. 20-B," subject to a credit of $2,784.35, miscellaneous items of income accruing to the estate of Richard Eppes, with interest on the several items constituting that sum from the 31st day of December of

each year in which they accrued, according to exhibit "E. W. T. No. 20-A," prepared by E. W. Tylar.

A further considerable sum was claimed by Mary Eppes for costs and expenses in the operation of the partnership. These expenditures are not allocated upon the books and records as between the individual property of Mary Eppes and the partnership. Two of the items included in this sum, one for salary in the sum of $31,485 and the other for office expenses amounting to $14,166.66, we think, can be allocated between the two interests. No portion of these expenses has been elsewhere charged against Richard Eppes.

Tylar admits that it was necessary to have an office through which the business of the partnership was to be conducted and to have some one to manage and control that office. By virtue of his position in the case, he asked to be relieved of any opinion as to how they should be prorated, and referred the question to Potts, as the one best qualified to make the division. He thought it proper that some general allowance should be made for overhead, and that the expenses should be prorated on some such basis as the proportion which the volume of Mary Eppes' personal business bore to the volume of the partnership business, but that the total amount chargeable to the estate of Richard Eppes should not exceed the amount an independent agent would have charged for the same service.

Potts, with his intimate acquaintance with both businesses, and to whom the whole of the salary was paid, with the exception of $150, testified as to his services, and said that the salary should be divided equally between Mary Eppes and the partnership account, and that the estate of Richard Eppes should be charged with one-third of one-half of the amount, or $5,247.50. He said that one-half of the office expenses should be likewise divided between the two interests, and that Richard Eppes' estate, therefore, should be charged with one-third of one-half of the total amount or $2,361.18. He based the allocation upon the proportion of his time given to the respective interests. This evidence is uncontradicted. Overhead expenses are inevi-

table in a large active business. Considering the necessity for the services mentioned, the respective amounts of business of each interest, during the period of sixteen years, the division of expenses seems fair and reasonable. The two sums of $5,247.50 and $2,361.18 should be charged against the estate of Richard Eppes, with interest thereon from January 1, 1930, an average date.

Mary Eppes, upon whom rested the burden to prove her claims, was unable to separate and identify the remaining unallocated expenditures as between her personal business and that of the partnership. None of the witnesses could do so from the records kept by her, although Potts undertook to make an estimated division from his general knowledge of her business. Consequently, neither the commissioner nor the trial court could allocate them except by mere guess. We are in the same situation. Allowance of credit for these claims must, therefore, be denied.

The trial court properly allowed Mary Eppes, under inquiry 4, credit for the two items mentioned in its decree. It should have gone further and allowed her the sum of $310.65 as an offset to $796.93, found by the commissioner to be due the estate,—the sum of $310.65 having been distributed to Mary Van Deusen Eppes in 1922, as shown on exhibit "E. W. T. 19-A"; and should have disallowed a charge against her for $48.53 on account of a note of Mary Nerantzski, as it appears from exhibit "E. W. T. 22-X" that Mrs. Mary Van Deusen Eppes received her full one-third of this note in 1927.

In all other respects, the ruling of the court in approving the report as to this inquiry was correct. The appellant was charged with interest only on personal property converted into money. The personal property on hand can be delivered in kind, so far as it still exists. It is not charged with interest, nor are damages for wear and tear, nor for loss from casualty awarded.

The 1936 decree held the estate of Richard Eppes accountable for the profits from the land purchased by him in his own name from Richard Eppes' Agent, as appear-

ing in the "Richard Eppes Agent Account." There was a binding and final adjudication, subject only to the ascertainment by the commissioner under inquiry 7 of the amount of such profits, if any, and whether they had been accounted for. The commissioner secured the information from the personal account books of Richard Eppes and from the records of the partnership, made and kept by Richard Eppes or under his supervision. These records disclosed that Richard realized a net profit of $15,666.16, in the year 1915, and $710 in 1921, a total of $16,375.16 from this source. Two-thirds of the latter amount belonged to his sisters, and the burden was on him to show that he paid it to them. There is no evidence in the record to show that he accounted for or paid any part thereof to either of them, or that these profits were in anywise considered in the adjustment and settlement had between the two parties on March 31, 1920.

It is provided by statute, Virginia Code, (1942) section 4359 (21), that a partner, under the above circumstances, is accountable as a fiduciary.

"(1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property.

"(2) This section applies also to the representatives of a deceased partner engaged in the liquidation of the affairs of the partnership as the personal representatives of the last surviving partner."

The trial court erred in overruling the commissioner's report under this inquiry. The estate of Richard Eppes should be charged with $10,916.77, that is, two-thirds of the total net profits, with interest thereon, except as to $710, from December 31, 1915, and interest on the $710 from December 31, 1921, as shown in the report of the commissioner.

The 1936 decree, in accordance with the opinion of Judge Peterson, adjudicated that, inasmuch as "by an agreement be-

tween the parties," Mary Eppes and her sister "undertook to convey" to Richard Eppes "their two-third interest in satisfaction of his interest in that certain check for $31,976," * * * "which undertaking was never consummated in the lifetime of the said Richard Eppes," * * * the said Pecan Avenue property in respect to a two-third undivided interest therein as of the date of the death of the said Richard Eppes, be, and the same is hereby, charged with liability to the estate of Richard Eppes for an amount equivalent to one-third of the amount evidenced by the said check with interest thereon from the 6th day of January, 1916." This judgment was final and binding, subject only to the report by the commissioner of a description of the property, the value of a two-thirds interest therein as of the date of the death of Richard Eppes, March 27, 1922, the value of any improvements made thereon by his sisters after their undertaking to convey their interest to Richard, the purpose and occasion of the improvements, and their effect upon the value of the premises. The commissioner fully answered the inquiry and the evidence sustains his report.

Had Judge Peterson intended to award a judgment against Mary Eppes and her sister for one-third of the check, he would doubtless have said so, and made the judgment a lien upon all of their real estate instead of charging two-thirds of the described property with liability therefor. In such case there would have been no necessity for a reference in respect to this phase of the case.

No improvements were shown to have been made on this property subsequent to 1916. Those made in 1916, at a cost of $9,600, in pursuance of the sisters' agreement to convey their shares to their brother, were intended, as the trial court found, to constitute an offsetting value to Richard's one-third interest in the check. The value of the improvements, plus the value of their two-thirds share in the land thus approximately equalized one-third of the amount of the check. In other words, the interest of Richard Eppes in the check was intended to be commuted by the conveyance to him of his sisters' shares in the improved property,—a con-

veyance never actually made. *Eppes* v. *Eppes, supra,* pages 841 and 844.

The trial court erred in granting a personal judgment against Mary Eppes. A two-thirds undivided interest in the Pecan avenue property only should be charged with liability to the estate of Richard Eppes for one-third of the said check, that is, $10,658.66, with interest from January 6, 1916.

As to the proper allocation of $10,858.34, for general and operating expenses, the evidence shows that Richard Eppes, in charge of the business of the partnership at the time of the expenditures, entered, or caused to be entered, all of the items included therein on the books under his control, against the partnership account, sometimes known as the "Agency Account." No one could have known better than Richard Eppes, against whom the charge should be placed, and it is not likely that he would have made it against property in which he had an interest unless such entry was proper. The evidence of two auditor-witnesses, acquainted with the facts in the case, supports the conclusion of the commissioner and the trial court, that the amount was a proper charge against the partnership and not against Mary Eppes and her sister.

The evidence also supports the report of the commissioner and the conclusion of the trial court that the overdraft of $7,957.11 appearing in the personal account of Richard Eppes was discharged in an accounting between the parties as of March 31, 1920. On that date, the parties in person, or by their attorneys, effected an adjustment of certain differences between them appearing in the books and records of the partnership. A discharge and settlement of the overdraft was directed and it was ordered removed as a charge against Richard Eppes. Richard Eppes was then alive and no further question was raised about this matter during his lifetime, nor until after this suit was brought.

The assignments of cross-error relating to the credits of $28,553.17 and $10,858.34 have been disposed of in our consideration of inquiries numbered 2 and 9, and that one relat-

ing to partnership notes taken as part-payment for lots sold between 1915 and 1922, and alleged to have been unaccounted for by Mary Eppes, has been determined under inquiry number 4.

The cross-assignment relating to a one-third interest in a sum stated generally in appellee's brief as $19,000, "miscellaneous cash," has been considered in connection with the several inquiries. Reference is apparently made thereby to an item for interest in the sum of $3,749.63 and to another for "miscellaneous items of income," $2,784.38, shown on exhibit "E. W. T. No. 20-A." Three times the total of these two items amounts to $19,601.98. The first item is covered by the allowance of interest on the balance due Richard Eppes' estate under inquiry 3. The sum for "miscellaneous items" has been hereinbefore allowed in our consideration of the same inquiry.

■ The fourth assignment of cross-error relates to a claim for rent of a room used as an office for the conduct of both the partnership business and the personal business of Mary Eppes. This claim is without merit. It was necessary to maintain an office to conduct the business of the partnership. There is no proof of the rental value of the office space, which was used for the conduct of her business. The rent of other persons who occupied space in the same room has been accounted for.

The further adjudication and the settlement of the receipts and disbursements of the partnership property and of the obligations, rights, and benefits of several parties arising from the operation of the partnership properties, and assets for the period of December 31, 1937, onward, not included in the commissioner's report, shall be made in accordance with the principles and adjudications enunciated in *Eppes* v. *Eppes, supra,* and in this opinion.

■ The sum of $2,500, asked by the commissioner for his services, and $675, charged by E. W. Tylar for accounting and auditing services, are reasonable and should be allowed.

 Under the peculiar circumstances of the case, we are further of opinion that the cost of these proceedings, including the above allowances, in the trial court to the date of the decree appealed from, November 14, 1942, should be borne by the parties in proportion to their respective interests in the partnership, that is, two-thirds by Mary Eppes and one-third by the estate of Richard Eppes.

The record in the present appeal consists of 398 pages. The appellant's opening brief is printed on 40 pages, and her reply on 49 pages. Notwithstanding our disapproval of the size of the brief filed by counsel for the appellees in *Eppes* v. *Eppes, supra,* he has filed here a reply brief of 246 pages, to which is added an appendix of 45 pages in small print, containing a citation of objections and exceptions to the report of the commissioner. Many pages in this reply volume are consumed by an innumerable repetition of charges of delinquency, bad faith, and fraud against the appellant, none of which repetition has been necessary or helpful. In failing to be short and concise, appellees' counsel has violated Rule 14 of this court.

 The appellant having substantially prevailed in this appeal, the costs thereof will be awarded against the appellees.

For the reasons assigned this decree appealed from is accordingly reversed in part, affirmed in part, and remanded with the direction that a decree be entered in conformity with the views herein expressed.

*Reversed in part, affirmed in part,*
*and remanded.*