# CIRCUIT COURT OF THE CITY OF RICHMOND

Margaret H. Howell

v.

George C. Howell, III

September 4, 1998

Case No. HH-1013-3

By Judge T. J. Markow

This case is before the court on the parties' exceptions to the report of the Commissioner in Chancery. The plaintiff is Margaret H. Howell; the defendant is George C. Howell, III.

### Background and Procedural History

The parties were married on June 26, 1982 in Richmond, Virginia. Two children were born of the marriage, Margaret Sloan Howell (1984) and George C. Howell, IV (1986). The parties last lived together as husband and wife on November 17, 1995. The children currently reside with the plaintiff at the marital residence, 16 Greenway Lane in Richmond. A Bill of Complaint for divorce was filed on September 9, 1996. The Decree of Reference to the Commissioner was entered on April 18, 1997. The Commissioner conducted an *ore tenus* evidentiary hearing on July 15 through 18 and August 14 through 15, 1997. The report was filed with this court on June 15, 1998; the parties' exceptions were filed on June 25, 1998. A hearing on these exceptions occurred on August 11, 1998.

*Standard of Review*

The weight to be given to the report of a Commissioner in Chancery is well established:

> The conclusions of a commissioner, where the evidence has been taken in his presence, should be sustained unless it plainly appears that they are *contrary to the law, unsupported by the evidence,* or *not warranted by any reasonable view of the evidence.* If the evidence is competent and substantial, the court does not have the arbitrary power to overturn the conclusions of fact based thereon.

*Eppes v. Eppes,* 181 Va. 970, 986 (1943) (citation omitted) (emphasis added). "When a chancellor refers a cause to a commissioner for assistance and relief from certain duties ... he does not delegate to the commissioner his judicial functions. He is not bound by the commissioner's recommendations." *Green v. Green,* 199 Va. 927, 931 (1958). However, the Commissioner's report, except as to errors appearing on its face, is *prima facie* correct when the evidence is in conflict. *See Buckle v. Marshall,* 176 Va. 139, 147 (1940). Further:

> [w]hen ... the commissioner has seen and examined the witnesses, and the testimony is conflicting, and his conclusions are clearly supported by competent and unimpeached witnesses, the court will not set aside or disturb his report, unless the weight of the testimony which is contrary to his conclusions is such, on account of the number of the witnesses and the nature of their evidence, as to make it clear that the commissioner has erred.

*Horne v. Osborne,* 163 Va. 235, 239 (1934) (citation omitted).

*Defendant's Exceptions*

A. *Hunton & Williams Partnership Interest*

The defendant's partnership interest in Hunton & Williams, acquired by him during the marriage, is classified as a marital asset pursuant to Va. Code § 20-107.3(A)(2). However, the defendant contends that the Commissioner erred in determining that his partnership interest has a goodwill component.

"Goodwill has been defined as 'the increased value of the business, over and above the value of its assets, that results from the expectation of continued public patronage.' The reputation of an individual, as well as his or her future earning capacity, are not considered to be components of goodwill." *Russell v. Russell*, 11 Va. App. 411, 415-16 (1990). The court acknowledges that it is improper to sell the good will of a law firm and that a law practice, other than physical assets or leasehold, cannot be sold, transferred, or otherwise conveyed for value as a going business. *See* Va. Code of Prof. Resp., EC 4-6; L.E.O. 956. Nonetheless, the court's duty is to determine the valuation of the plaintiff's monetary award, to include her share of the parties' marital property.

Article VII of the Hunton & Williams partnership agreement provides that when a partner withdraws from his association with the firm, the recovery is limited to the current balance of his capital account together with his share of the firm's net income through the date of withdrawal. Capital has been withheld from the defendants' final distribution at the end of each fiscal year since he became a partner in 1989. Thus, the defendant maintains that the value of his stake in Hunton & Williams is the balance of his capital account, $83,639, as of the most recent valuation date, March 31, 1997, together with his additional partner's share, for a total of $85,614.

In addressing the defendant's concerns, the court must first determine whether it is appropriate to compute goodwill here and, if so, ascertain how this figure should be computed. The parties cite to many of the same cases to support their respective positions. According to the Court of Appeals, "[t]rial courts valuing marital property for the purpose of making a monetary award must determine from the evidence that value which represents the property's *intrinsic worth to the parties* upon dissolution of the marriage." *Bosserman v. Bosserman*, 9 Va. App. 1, 5 (1989) (emphasis added). "When stock is subject to a restrictive transfer agreement … the price fixed by such provision will *not* control its value, but the restriction on transfer is a [single] factor which affects the value of stock for purposes of equitable distribution." *Id.* at 7 (emphasis added). Mr. Bosserman owned a farm together with his three brothers, an asset which was subject to valuation upon dissolution of his marriage. The by-laws governing transfer of stock in this closely held corporation specified that a shareholder desiring to sell his stock must first offer it for sale to the corporation at its "true book value" before selling it to a third party. *Id.* at 3. While conceding that the method of valuation depends upon the circumstances of each case, the Court of Appeals determined that the value of the stock in this farming corporation should be based on the "fair market value" in order to account for intrinsic value (in contrast to the "true book value" as determined by a vote of three appraisers).

More important, and the subject of much debate by counsel here, is the Court's discussion of the factors which constitute the fair market value of stock in a closely held corporation. Generally, in determining the stock value in such entities, "[t]he goal is to arrive at a fair market value for a stock for which there is no market." *Id.* at 8, n. 1. To do this, "all available financial data, as well as all relevant factors affecting the fair market value, should be considered [e.g.] ... the history of the firm, the nature of the company, the outlook for the industry, the book value of the stock ... the earning and dividend-paying capacities of the company, and the existence of *goodwill* or other intangible assets." *Id.* (quoting I.R.S. Rev. Rul. 59-60) (emphasis added). The existence (or absence) of this goodwill component in the defendant's Hunton & Williams partnership share is at issue here.

Despite the obvious factual distinctions between *Bosserman* and the instant case (e.g., number of shareholders; right of first refusal versus exclusive buy out provision; closed versus open membership) the relevant factors affecting fair market value of stock in a closely-held corporation, as derived from Internal Revenue Service rulings, are instructive of the criteria to be considered in valuing a partnership interest in an entity such as Hunton & Williams.

In further derogation of *Bosserman*, the defendant cites various cases for the proposition that the value of a husband's stake in a professional corporation is governed *exclusively* by the terms of the partnership buy out agreement (precluding the valuation of any goodwill component). In *Kaufman v. Kaufman*, 7 Va. App. 488 (1988), the Court of Appeals found that the value of a husband's stake in a medical practice was determined by the terms of a binding and exclusive buy out agreement executed with the corporation. Although the husband held an equity stake in the business (albeit worthless), the wife sought a share of the corporation's accounts receivable or work in progress. The Court of Appeals upheld the trial court's denial of her request and adhered to the terms of the exclusive buy out agreement. The persuasiveness of the *Kaufman* ruling is weakened by the fact that Mr. Kaufman had not purchased the business interest until six months *after* the parties' separation. The *Kaufman* holding is merely an admission that the wife was not entitled to the other elements sought, rather than a rejection of a goodwill valuation. The Court did not specifically elaborate on the concept of goodwill.

In *Schill v. Schill*, No. 1636-96-2 (Va. App. June 10, 1997), the Court of Appeals upheld the Henrico Circuit Court decision that there was no goodwill value associated with the husband's partnership interest in McGuire, Woods, Battle & Boothe. "[T]he trial court's decision regarding goodwill 'will not be

disturbed ·if it appears that the court made a reasonable approximation of the goodwill value, if any, of the professional practice based on competent evidence and the use of a sound method supported by that evidence'." *Id.* at 5 (citing *Russell*, 11 Va. App. at 417). While the expert testimony on goodwill value conflicted, the Court of Appeals found that the trial court's conclusion was supported by credible evidence.

The defendant here maintains that the McGuire Woods partnership agreement in *Schill* has an exclusive buy out provision "similar to" the one found in Article VII of the Hunton & Williams partnership agreement (i.e., accounts receivable and work in progress were not to be considered in determining buy out value, but investment in client services is compensated upon severance). *See generally Patterson v. Patterson*, No. HE-1069-1 (Richmond, June 21, 1995) (Johnson, J.) (wife awarded credit for share of husband's McGuire Woods ICS account). Other than this general assertion, the Commissioner heard no evidence on the precise market valuations of the various partnership agreements discussed by the other Circuit Courts (e.g., McGuire, Woods, Battle & Boothe or Mays & Valentine). As such, the *Schill* decision presents no barrier to a finding of goodwill by the Commissioner here. The Commissioner was charged with evaluating the competing evidence and reaching a conclusion, not weighing the merits of hypothetically similar partnership agreements without concrete figures.

The defendant also cites various Circuit Court decisions which held that goodwill is not a factor in the valuation of a spouse's share in a law partnership. The unpublished letter opinion in *Rosbe v. Rosbe*, No. CH91-1045 (Chesterfield County, Feb. 5, 1995), concerned a husband's motion to quash a subpoena *duces tecum* served on his law firm, Hunton & Williams. The court ruled that *Bosserman* is inapposite and that· the terms of the partnership agreement are the *sole* basis for valuing the husband's partnership interest. Judge Shelton was persuaded by the fact that the husband could not transfer or assign his partnership interest to a third party, which was permitted in *Bosserman*. In reaching its decision to quash the subpoena *duces tecum*, the Chesterfield Circuit Court heard no evidence on the valuation itself or the methodology utilized by the wife's expert. In contrast, the Commissioner here heard testimony from the plaintiff's expert on the valuation method utilized and the analysis giving rise to his conclusion that the partnership interest should be valued at $319,659.00, rather than $85,614.00 (per Article VII of the partnership agreement).

One year after *Bosserman*, the Court of Appeals addressed the valuation of a husband's psychiatric practice for purposes of equitable distribution in *Russell v. Russell*, 11 Va. App. 411 (1990). The Court first addressed whether

the trial court properly determined from the greater weight of the evidence that this professional practice had goodwill value. Judge (now Justice) Keenan embraced the majority view that "goodwill is an asset of a professional practice subject to valuation as marital property." *Id.* at 416. The Court cautioned: "[t]o hold otherwise would result in a windfall to the professional spouse. This would derive from the failure to consider part of the value of an asset already classified as marital property." *Id.* The only disputed matter on appeal was the methodology employed for valuing goodwill, *not* whether goodwill value was appropriate. The fact that the husband intentionally suppressed his earnings was not determinative of *whether* goodwill existed in *Russell*, it only pertained to *how* value would be accorded to goodwill in light of the decreased gross earnings. The Court left the door open on whether goodwill always exists: "Under the facts of a given case, a professional practice may have no goodwill value." *Id.*

The significant factual differences between *Russell* and the instant case (e.g., sole practitioner versus large partnership) lead this court to briefly review two cases relied upon by Judge Keenan. For example, *Dugan v. Dugan*, 457 A.2d 1, 22-23 (N.J. 1983), concerned a finding of goodwill value in a solo legal practice. The New Jersey Supreme Court specifically discussed the differences between solo practice and partnerships. "A legal partnership agreement providing for payment upon a partner's retirement or death of an amount *in excess of* the capital account balance presumably represents a share of the goodwill in the firm." *Id.* at 22 (emphasis added). "[M]embers of a law firm may provide [in the terms of the partnership agreement] for selling their interest therein, *including goodwill*, and solo practitioners may not." *Id.* at 23 (emphasis added). In rebuttal to the court's presumption in *Dugan*, Article VII of the Hunton & Williams partnership agreement provides that upon a partner's withdrawal, his recovery is limited to the current balance of his capital account together with his share of the firm's net income through the date of withdrawal. No provision is made for goodwill. No mechanism existed in the defendant's partnership agreement (or his deferred compensation plan) to compensate him for work in progress, accounts receivable balance, or intrinsic value derived from association with the firm. According to *Russell*, this latter asset has value and presents a factual issue which must be determined here. Obviously, the Commissioner did not presume the existence of goodwill, but heard extensive evidence on its existence and valuation.

The Kentucky Court of Appeals accepted the majority rule without discussion, however. In *Heller v. Heller*, 672 S.W.2d 945 (Ky. App. 1984), the court valued a solo accounting practice which had been purchased during marriage for a price which included a *specific* goodwill component. There was

no evidence that Mr. Howell's contributions to his capital account included a specific goodwill component. Despite the fact that the defendant will not be compensated for goodwill upon his severance from the firm, the plaintiff seeks an amount above and beyond his capital contributions as representative of goodwill value. The absence of a predetermined goodwill valuation will not prevent this court from assigning one now.

The factual scenarios distinguishing the aforementioned cases from the instant suit lead this court to carefully consider whether competent and substantial evidence supports the Commissioner's finding that the defendant's professional practice has goodwill value. *See Eppes v. Eppes*, 181 Va. 970 (1943). Robert P. Raymond, a partner in the accounting firm of Raymond and Colesar, provided expert testimony on law firm valuation for the plaintiff. Raymond estimated that the total value of the defendant's interest in the Hunton & Williams partnership as of July 15, 1997, was $319,659. His report provided an explanation of goodwill, defined as intangible value which represents the expectation of a stream of above-average earnings. Raymond asserted that "an interest in [Hunton & Williams] will have [intrinsic] value to the extent it allows the holder to earn more income than is realized by peers in comparable situations at other firms." The expert detailed his valuation approach, selecting a "bottom-up" variation on the income method, i.e., "the value of the partnership interest is measured with reference to the expected cash flows it will produce directly to the interest holder discounted at a rate reflecting the risk of realizing such economic benefits."

William Stephens, a partner in the accounting firm of Keiter, Stephens, Hurst, Gary & Shreaves, testified for the defendant. His report concedes early on that intangible assets such as goodwill do have value in a law practice, a component which must be valued independent of any severance provision in the partnership agreement. Contradicting himself, Stephens later concludes that the partnership agreement should exclusively determine the share value, arriving at a figure of $86,770. Adding to the confusion, Stephens provided that, *if* the court was to decide that the partnership agreement does not control the valuation, then the total fair market value of the defendant's non-marketable minority interest (including goodwill) in the Hunton & Williams partnership as of March 31, 1996, was $105,177. Stephens also applied the capitalized excess earnings method, roughly defined by him as "compensation over and above the individual's level of actual performance," to arrive at his valuation of goodwill.

The Commissioner determined that the greater weight of the evidence demonstrates that the Hunton & Williams partnership has goodwill or intangible value, and that the defendant's interest should not be valued solely

by reference to the partnership agreement and the resulting repayment of his capital contribution. The method of valuation utilized depends on the expert testimony and facts presented in the case. *Russell*, 11 Va. App. at 417. Here, both experts agree that the capitalization of excess earnings is the appropriate method. The experts differed in two key respects (in addition to the obvious issue of whether Article VII of the partnership agreement controls the valuation).

First, Raymond and Stephens disagree as to the appropriate peer group for purposes of determining the defendant's excess compensation above the median compensation for attorneys in his field. Raymond looked at a cross-section of attorneys featured in the Altman Weil Pensa, Inc., *Survey of Law Firm Economics* over a period of three years. He concentrated on areas of comparable size and population (half a million to a million); attorneys that specialize in non-litigation tax services; attorneys with comparably sized law firms; attorneys who have had the same number of years at the bar as Mr. Howell; the same number of years in the same population; and the same number of years practicing tax law. Raymond stated that the $38,269 in excess compensation above the median average (not including bonuses) earned by Mr. Howell represents a premium due to his association with Hunton & Williams. In contrast, the peer group utilized by Stephens was inherently flawed in several respects. First, Stephens compared the 1996 Hunton & Williams data to fifteen firms in *The American Lawyer* AmLaw 100 study, which was published in 1996 but utilized *1995* figures. Further, only one year was considered for peer group comparison purposes, albeit incorrectly. Hunton & Williams was the only firm in the AmLaw excerpt not headquartered in a "major" U.S. city, e.g., New York, Los Angeles, Houston, San Francisco, Washington, D.C., Atlanta, Boston, or Chicago. Stephens readily admitted that the defendant identified those firms which he considered to be his professional peers. The defendant's expert also reviewed the Altman Weil report, once again considering data from the 1996 issue (which was collected from 1995 figures). Given these errors, the Commissioner did not err in placing greater weight on the evidence presented by the plaintiff's expert. The evidence offered by the defendant's expert simply does not require a finding that the wrong peer group was utilized by the Commissioner to determine the defendant's excess earnings.

Second, the experts disagreed on the appropriate discount rate to be applied to the value of the defendant's share in Hunton & Williams. Stephens applied a forty percent discount to account for the lack of marketability of the defendant's interest and a thirty percent discount to account for the defendant's minority stake (i.e., lack of control). Raymond applied a 6.9 nine percent

discount rate (the discount rate typical of risk free investments such as twenty-year treasury bills). The court agrees with the Commissioner's findings that lack of control is not a significant factor to be considered, as no *one* partner has a controlling interest in Hunton & Williams. Similarly, the large discount for lack of marketability was inappropriate, as the highest and best use for the defendant's share is to remain with Hunton & Williams; an interest in a Virginia legal services corporation may not be bought or sold.

In sum, the decision of the Commissioner that the defendant's partnership interest in Hunton & Williams has an intrinsic value to these parties of $319,659 is supported by substantial and competent evidence. Defendant's exception is therefore overruled.

The Commissioner erred, however, in suggesting that Defendant pay the Plaintiff her one-half share "as benefits are payable to George." As Defendant notes this is an intangible asset not payable to him. He proposes to pay the share over ten years. Plaintiff wants immediate payment. The court will order payment over five years in quarterly payments with interest at the judgment rate of 9% *per annum*.

## B. *Crestar Money Market Classification*

The defendant maintains that the Crestar Money Market account valued at $203,288.46 is his post-separation separate property, rather than a hybrid asset as determined by the Commissioner. The Commissioner determined that the separate portion was $164,933.00 and the marital portion was $38,355.00. The classification of this property is complicated by transactions which occurred after the parties' separation and which involved the defendant's use of an equity line of credit secured by the marital home. The defendant argues that the Commissioner's determination of the marital portion was based on the erroneous conclusion that certain tax payments and expenses incurred by the defendant were not made for a valid marital purpose.

In cases where dissipation of marital assets is alleged, the party who last controlled the funds must prove the propriety of the expenditure by a preponderance of the evidence. *Amburn v. Amburn*, 13 Va. App. 661, 666 (1992). The defendant contends that the $22,050 estimated tax payment made in June 1996 was attributed to income earned during the *pre*-separation period and was used for marital purposes. The court notes that the defendant previously estimated this tax payment at $27,200 at the Commissioner's hearing. In any event, the disbursement to the I.R.S. ($22,050 or $27,200) represented far more than the tax liability on the marital portion ($31,530) of the defendant's June 1996 bonus. Despite being attributed to the defendant's

performance during the fiscal year ended March 31, 1996, the bonus was not paid until the *next* fiscal year ending March 31, 1997 (post-separation). As such, payment of such a disproportionately large portion of the marital share to the I.R.S. under the guise of a joint obligation was incorrect. The court agrees with the Commissioner's finding and holds that the tax payment was not for a marital purpose. Allocating a share of the Crestar Money Market account to the plaintiff in order to make up for this shortfall is appropriate. Similarly, the court agrees with the Commissioner's findings as to the $11,355 of disallowed expenses paid out of marital assets by the defendant.

## C. *Debt Allocation*

The defendant objects to the Commissioner's recommendation that he pay all of the parties' debts. Specifically, the Commissioner recommended that the defendant be solely responsible for the $122,129.50 balance of the Crestar equity line; repayment of two 1997 Crestar Bank Loans in the amounts of $53,700 and $29,461 (this amount is repeatedly listed as $22,461 in the hearing transcript); and the $2,191 balance of the joint Crestar Visa account.

The Crestar equity line was incurred for marital purposes and was a marital debt benefiting both parties. It was used to fund joint expenses and debts incurred during their marriage and subsequent to the parties' separation. Only interest has been paid on the note since the parties' separation, with the exception of a $71,652.72 payment towards principal in April 1996. The defendant asserts that the Commissioner's recommendation will result in Mrs. Howell receiving both the equity value of the home (based upon the existing debt encumbering the property), as well as the increased equity that will result from the defendant's payment of the second lien. In valuing the marital estate, the Commissioner specifically provided that the equity line on the marital residence would be *excluded* from the calculation of the net value of the home awarded to the plaintiff. As such, the net value of the marital home awarded to the plaintiff is $207,254. There is no risk of double-dipping on the basis of the husband's responsibility for the Crestar equity line. The Commissioner considered all of the factors enumerated in Va. Code § 20-107.3 in reaching his decision that the defendant should assume responsibility for the equity line. Specifically, he stated that (1) the defendant has received a larger portion of the net value of the marital estate; (2) the defendant has greater liquid assets than the plaintiff; (3) the defendant has superior financial resources with which to pay the Crestar equity line; and (4) burdening the plaintiff with equity line payments would nullify the recommended award. However, the court disregards the Commissioner's citation to the circumstances leading to the

dissolution of the marriage as pertinent to the debt allocation. *See Aster v. Gross*, 7 Va. App. 1 (1988) (distinguishing Va. Code 20-107.3(E)(5)). In short, the court finds that the Crestar equity line was a marital debt and properly allocated to the defendant.

The defendant's separate debts included the two Crestar loans. The Commissioner contends that the two bank loans were made at a time when the defendant was transferring funds into his separate Crestar Money Market account following the receipt of the March and June 1996 partnership distribution and bonus. The defendant argues that the $53,700 loan was made to cover upcoming private school tuition and estimated tax payments because the plaintiff had blocked his access to the Crestar equity line. The $22,461 loan was made for similar purposes. The defendant is entirely correct in asserting that the tax liabilities, private school tuition, and household debts would have been incurred regardless of the separation. The distinguishing factor is the manner in which the defendant chose to satisfy these joint obligations. This separate debt incurred by the defendant, although utilized to pay joint obligations, should never have been incurred given his existing financial resources (e.g., the Crestar Money Market account). The plaintiff will not be charged with repayment of either of these Crestar loans.

As for the $2,191 balance of the joint Crestar Visa account, the plaintiff argues that the defendant historically paid the balance in full each month during the marriage. Further, the defendant testified at the Commissioner's hearing that the Visa was the only major credit card possessed by the plaintiff following the separation. Some time after the separation, the defendant unilaterally lowered the credit line from $7,500 to $2,500 and began making interest-only payments of $60 to $70 per month. For the same reasons cited above with respect to payment of the Crestar equity line, the factors enumerated in Va. Code § 20-107.3 warrant designating this marital debt to the defendant.

## D. *Spousal Support*

> Where a claim for support is made by a party who has been held blameless for the marital breach, the law imposes upon the other party a duty, within the limits of his or her financial ability, to maintain the blameless party according to the station in life in which that party was accustomed to during the marriage.

*Gamble v. Gamble*, 14 Va. App. 558, 573-74 (1992). The defendant here takes exception with the recommendation that he pay $7,500 per month in spousal

support to the plaintiff. Such an award is governed by the factors enumerated in Va. Code § 20-107.1. In addition, many of the expenses were non-recurring (e.g., legal bills, car rental, home repairs, and medical costs).

Plaintiff's exhibit 1A provides monthly expense estimates for the period October 1994 through October 1995 (pre-separation), citing $8,746.92 in expenses for the plaintiff plus $3,017.23 for the children. The total amount is $11,764.15. Exhibit 1B provides the same figures for May 1996 through June 1997 (post-separation), adjusting the plaintiff's figure down to $8,013.76 plus a similar amount for the children. Both estimates include line items for the first deed of trust payment on the marital home (approximately $1,700), various unreimbursed medical costs, the children's private school tuition (approximately $1,600), the children's country club dues ($42), and other specific activity costs. In addition, the latter estimate includes the plaintiff's monthly legal bills (approximately $700). The defendant has agreed to make direct payment of the children's private school tuition; the defendant has assumed responsibility for the plaintiff's remaining legal bills. Agreeing with the Commissioner, the court finds that the plaintiff's legal bills and car rental should not be considered as a separate, recurring monthly expense. The Commissioner was also correct in accounting for the income tax liability to be incurred on the plaintiff's spousal support award. The issue of whether the Commissioner had sufficient evidence to fix the payment at $7,500 per month is disputed by the defendant.

The Commissioner determined that the plaintiff would receive an in-kind transfer of the ownership in the marital home, but she is to be solely responsible for payment on the first mortgage. The Commissioner's recommendation did not explicitly predicate the spousal support award upon the plaintiff's obligation to pay the first mortgage. Even though the figure selected ($7,500) has been adjusted to *delete* several discrete non-recurring expenses (e.g., legal costs and car rental) from the plaintiff's post-separation estimate ($8,013.76), there is still no implication that the Commissioner's award reflected consideration of the first mortgage. Even if it were otherwise, Plaintiff is entitled to an allowance for housing. There is adequate evidence here for the Commissioner to determine that the housing allowance requested by the Plaintiff was reasonable.

Once the plaintiff's state and federal tax liability on the spousal support ($2,000 per month according to her estimates) is taken into consideration, the Commissioner's suggested award is both logical and free of any accommodation for the plaintiff's assumption of the mortgage payment. In fact, once taxes are taken into consideration, such a spousal support award does *not* provide the financial means by which the plaintiff could satisfy both

the monthly mortgage obligation *and* all of her estimated monthly household expenses as detailed in Exhibit 1B. *See Gamble*, 14 Va. App. at 576 (distinguishing between considerations of spousal support and equitable distribution of marital property to prevent "double dip" by payee spouse). *But see Wilmott v. Wilmott*, No. 1260-96-4 (Va. App. Feb. 4, 1997) (no reversible error if trial court does not explicitly base spousal support award upon payee spouse's mortgage obligation on marital residence). The court finds that the plaintiff's monthly spousal support award should not be reduced by the amount of the first mortgage payment; the spousal support should remain fixed at $7,500.

The plaintiff estimated that the children's expenses were $3,116.07 per month. Based upon the relative obligations of the parties, the child support guidelines mandate that the defendant provide a monthly payment of $2,181. The defendant contends that the Commissioner improperly considered the tuition payments and country club dues in his deliberations. Subtracting these two items from the children's estimated monthly expenses would leave a balance of approximately $1,374.07 — not including the children's pro-rated share of the food, housing, utility, transportation and activity costs already accounted for in the plaintiff's spousal support award. The defendant argues that these pro-rated shares (amounting to two thirds of the plaintiff's estimated household expenses) should be *subtracted* from her spousal support award and included *solely* as elements of child support. The defendant cites *Rein v. Rein*, No. 1120-93-1 (Va. App. Nov. 29, 1994), as analogous to the Commissioner's findings here:

> The spousal support award was fashioned to include 100% of the housing mortgage expenses, automobile expenses, utilities, and other household expenses. However, the child support award was determined from the presumptive support tables without deviation and, therefore, reflects consideration of housing costs and other expenses for which the wife received 100% payment in the spousal support award.

The court declines to follow *Rein. See* Va. Code 17.1-413 (unreported opinions shall have no precedential value or significance). According to the defendant's calculations, a two-thirds reduction of the plaintiff's monthly expenses estimate to account for alleged "double-dipping" between the spousal and child support awards would amount to a $2,938.83 debit from the spousal component. This would leave the plaintiff with $6,742.17 in combined spousal and child support, an amount neither sufficient to meet her demonstrated needs

nor adequate to maintain the plaintiff and her children in the station in life in which they were accustomed to during the marriage. In conclusion, the court concurs with the award to the plaintiff of $7,500 in spousal support and $2,181 in child support.

## E. *Custody*

The issue of custody was not specifically referred to the Commissioner, but both parties presented extensive evidence on this matter. The Commissioner recommended that the best interests of the children warranted placing sole legal custody with the plaintiff. The defendant objects and seeks joint legal custody, with physical custody and the children's primary resident remaining with the plaintiff subject to reasonable rights of visitation.

The court finds that the Commissioner's decision was supported by both the evidence and the law. Joint legal custody is unlikely to be in the best interests of the children where there is significant hostility from the child toward the parent especially where the child is an adolescent. Until that relationship somewhat heals joint legal custody is inappropriate.

## F. *Attorney's Fees and Costs*

The defendant's exception to the Commissioner's recommendation on these matters has been withdrawn.

### *Plaintiff's Exceptions*

## A. *Uninsured Medical Expenses*

The plaintiff requests that the defendant assume responsibility for all uninsured medical expenses incurred by the children, e.g., medical, orthodontic, counseling, prescription, and other health care expenses which are not covered by insurance. The Commissioner failed to make a recommendation on this issue.

Extraordinary uninsured health care expenses are to be included in the child support obligation with the Defendant paying 80% of the expenses and the Plaintiff 20%.

## B. *Life Insurance Beneficiaries*

The plaintiff requests that the defendant be required to designate the two children as beneficiaries of his existing life insurance policies for so long as the defendant is obligated to pay child support. While the Commissioner made no recommendation on this issue, the court has the authority over this matter pursuant to Va. Code § 20-108.1(D). Defendant has expressed his intention of making these changes to his policies. To avoid further disputes, the Final Decree should incorporate his agreement.