# Richmond

MARION AYRES V. HARLEYSVILLE MUTUAL CASUALTY COMPANY, GARNISHEE, ETC.

April 10, 1939.

Record No. 2047.

Present, All the Justices.

The opinion states the case.

*J. Tinsley Coleman, Jr.,* and *John D. Easley,* for the plaintiff in error.

*Sinnott & May, V. P. Randolph, Jr.,* and *Irvin Bendiner,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

A man named David Aronovitch, sometimes operating, as well, under the trade name of King's Distributors, was engaged in the business of supplying retailers with beer which was procured, in part, from a brewery in the city of Rochester, New York, and distributed from the firm's warerooms in Lynchburg, Virginia. For its purposes the firm had five trucks, upon which it carried liability insurance with the defendant in error, Harleysville Mutual Casualty Company, Harleysville, Pennsylvania.

Hereafter the firm will be referred to as the insured, the Casualty Company as the insurer and the plaintiff in error, Ayres, as the plaintiff.

At the time of the accident, which is the basis of this action, the insured's Dodge tractor, connected with its Black Diamond semi-trailer, was on its way from Lynchburg to Rochester in charge of a man named Scruggs, who was driving the vehicle at the moment, and by whose side the plaintiff was sitting, not, at the time, doing any particular thing. The facts incident to the relation of these two men to the insured and to each other and to the truck, present no conflict.

The case of *Aronovitch* v. *Ayres,* 169 Va. 308, 193 S. E. 524, 525, is the forerunner to this case. This case grew out of that. In that case, which sounded in tort, Ayres, the plaintiff, who was very seriously injured in the accident, recovered a verdict and judgment against the insured for $20,607. A portion only of this judgment was paid. It was proven in that case, which was its turning point, that the insured was negligent in failing to have his truck properly equipped and in having brakes thereon which were either insufficient or maladjusted.

In the opinion in that case, this was said: "About two weeks later he (Ayres) was reemployed as *helper* and *assistant driver* to a man named Scruggs. In that capacity two trips north were made, and it was on his third trip, and on October 16th, that the accident under review occurred. Scruggs was in general charge; Ayres was his assistant and relief driver."

Speaking of the duty of the insured to have adequate and properly adjusted brakes upon the truck, this was said: "This obligation was recognized by the owner who directed Scruggs to inspect the truck, its brakes, etc., at the end of each hundred miles and to keep equipment up to standard. Moreover, Ayres said that Aronovitch gave him specific instructions to report to Scruggs anything which might need attention. Something did need attention. Ayres twice told Scruggs on their last trip that the brakes were not holding, and Scruggs twice promised to give them prompt attention."

The following statement was also made: "It is also true that Ayres and Scruggs were in fact in some aspects of their service fellow-servants."

And again we quote the following: "Each in shifts drove the truck and each helped to load and unload it. But, as we have seen, its care was in terms put upon Scruggs alone; to him Ayres was directed to report and did report. Upon him was placed the burden of seeing that it was kept in condition. He was, *quoad* this duty, vice-principal."

These observations are well fortified by the evidence in that case. The evidence in this case accentuates the facts upon which they are predicated.

The evidence, here, shows that on the long distance trips described, using the trailer type truck, two men were necessary for its safe conduct. In fact, Aronovitch, himself, testified to this and he further described Ayres' duties in this way: "He was to be a driver with the other man on the truck for the purpose of driving the truck from Lynchburg to the point of destination and back again."

Upon the judgment for the plaintiff an execution was issued and upon suggestion of liability of the insurer a garnishee summons was sued out against the insured and the insurer, requiring the latter to answer the suggestion and to disclose whether it was really a debtor to the insured, Aronovitch. The insurer denied liability and evidence was taken upon the issue.

The trial court sustained the motion of the insurer to strike the evidence and directed the jury to return a verdict in favor of the insurer, holding that the plaintiff came within the exception in the insurance policy.

The pertinent portion of the exception in the policy is the following: "Nor shall any policy cover injury to any employee or employees of the insured while engaged in operating or caring for any of the automobiles covered by this policy."

Our concern is with the meaning of these few lines comprising twenty-nine words, appearing in the setting which is afforded by the facts stated. Thus our task is within restricted lines.

The text writers and the courts speak of exceptions found in automobile insurance policies similar to the one we have quoted as "exclusive clauses." The petition and brief of the plaintiff in error states that the clause in question is "plain and unambiguous." With this we are in agreement, unless there be a latent ambiguity which is relieved by the extraneous facts which are furnished by the circumstances which cannot be separated from a fair view of the matter.

It is urged by the plaintiff in error, with ability and ingenuity, that the clause in question does not exclude him from the operation and effect of the insurance feature of the policy because, forsooth, he was not engaged in operating or caring for the truck at the time of the accident. He argues that the word "while" in the connection in which it is used refers to and means the precise time of the accident; that the word "engaged" refers, in its connection, to the specific personal action at the specific time, and that the phrase "in operating or caring for" signifies the manual, physical control of the movement of the truck, in other words, to the act of driving it at the precise time of the accident.

The insurer contends *contra* that if the meaning urged above be adopted, the obvious intention of the parties to the contract would be frustrated; that the patent meaning of the clause would be defeated by a strained, narrow,

unnatural and unjustified construction; that, in short, the court is asked to make a contract for the parties which they did not make for themselves and never intended to make. This, of course, a court cannot do.

 The text writers and the cases from the appellate courts of nearly all of the states accentuate the rule that ambiguous and doubtful language must be interpreted most strongly against the insurer. They stress the rule that insurance policies are to be liberally construed in favor of the assured and exceptions and exclusions are to be strictly construed against the insurer.

In this connection we quote the following from Cyclopedia of Insurance Law (Couch) vol. 1, section 188a, page 402:

"Various reasons have been assigned for the rule of construction against the insurer and in favor of the insured. Perhaps the most generally assigned reason for the rule is, in effect, that to hold otherwise, without an absolute necessity therefor, would tend to subvert the very object and purposes of insurance, which is that of indemnity to the insured in case of loss or the payment of money on the happening of a contingency, which indemnity should be effectuated, rather than defeated, to which end the law makes every rational intendment, so as to give the fullest protection possible to the interests of the assured. In fact, where two interpretations equally fair may be made, that which allows a greater indemnity will prevail. And since indemnity is the ultimate object of insurance, the construction should be in favor thereof, and likewise for the benefit of the trade, for, in case of doubtful construction, insurance is regarded as a contract unberrimae [sic] fidei. And every presumption in favor of good faith will be indulged in in construing policy clauses, the presumption being that an insurance company, in choosing the language of its policy, did not intend any jugglery or equivocation. This is in accordance with the rule that policies of insurance create reciprocal rights and obligations which require the utmost good faith by both parties. And the strictum jus or apex juris is not to be laid hold on. And the reason for the rule of construc-

tion against the insurer is that policies of insurance are made or printed forms carefully prepared in the light of wide experience, by experts employed by the insurer, and in the preparation of which the insured has no voice. Still another version of this reason is that the rule is based on the fact that insurance contracts are usually prepared by the insurer, who seeks so to frame them as to limit their scope, so that it is only fair that any doubt as to the meaning of the language used should be resolved in favor of the insured, in order to avoid the injustice that would result from a narrow and technical construction. That is, contracts of insurance couched in language selected by the company for its own purpose, and printed and prepared by skilled experts, and offered to the lay public, must, when ambiguous, be construed in favor of the assured, or, in other words, that since the language of the policy is that of the insurer, it is both reasonable and just that its own words should be construed most strongly against it. Also, that insurance contracts are to be interpreted, except, perhaps, where the language used follows a statutory form or provision, in the light of the fact that they are drawn by the insurer, and are rarely, if ever, understood by the people who pay the premiums, * * * ."

This very strong statement of the law is written by a learned and distinguished author. A stronger and more arresting statement could hardly be made than that which informs us that to the end that indemnity should be effectuated rather than defeated, the law makes every rational intendment. As authority for the statement the author cites literally hundreds of cases from the United States courts, the courts of thirty-nine of the states, the District of Columbia and England.

Hardly less strong is the following quotation from American Jurisprudence, vol. 12, section 252, page 795:

"Doubtful language in contracts should be interpreted most strongly against the party who uses it. A written agreement should, in case of doubt, be interpreted against the party who has drawn it. * * * It is also said that

if other things are equal, an interpretation most beneficial to the promisee will be adopted where the terms of an instrument and the relationship of the parties leave it doubtful whether words are used in an enlarged or a restricted sense. To state the same proposition conversely, it may be said that everything is to be taken most strongly against the party on whom the obligation of the contract rests. * * * "

Thus we see that there is such insistent adherence to the rule, that the tendency, for the purpose, is to get away from the existence of patent ambiguity, as a reason, and rest the interpretation or construction on the question as to whether there is doubt as to the sense in which the words are used, that is, whether the sense is that of enlargement or restriction.

If we dissect the exclusion clause which we are considering and give to its controlling words the meaning and sense which is given them by the plaintiff, and there is respectable authority for such meaning, then, beyond question, there arises real doubt as to whether the words are used in an enlarged or restricted sense. That being so, their meaning and intendment must be taken most strongly against the insurer upon whom the obligation of the contract rests. The law makes every rational intendment to the end that the purpose of insurance, which is that of indemnity to the insured, should be effectuated.

Let us look for a moment at the meanings of some of the words appearing in the exclusion clause, as found in Webster's New International Dictionary, Second Edition. "While" is defined as "a space of time, especially when short and marked by some action or happening." "Engaged" means "occupied; employed." "Operate" means "to manage; to conduct; to work; as, to operate a machine or motor vehicle." "Care for" is defined as "to watch over, foster or guard."

"The word 'operate,' as used in automobile policies, is held to mean to regulate and control the management or operation of the car, that is, to have charge of it as the

driver." American Jurisprudence, vol. 5, section 506, page 790.

We here see that the word "operate" is used in a restricted sense and it is a fact that the plaintiff was sitting in the truck on the seat by the side of the driver at the time of the accident when he was at perfect ease, engaged in none of the things embraced in the exclusion clause.

This view is supported by the statutory definition of an "operator of a motor vehicle" found in the Code of Virginia, section 2154 (170) : "Every person, other than a chauffeur, in actual physical control of a motor vehicle on a highway." A chauffeur is excluded from the operation of this definition because of the application to him of a different classification for the purpose of a license.

We have detailed the elements of the clause as importing a restricted sense of their meaning. An enlarged sense is found in the observation that the plaintiff was a helper of the man who was in charge of the truck; that he drove when he was called upon to do so; that he helped load and unload it; that he was an assistant and relief driver who received the same pay as the driver; and all of these relations might readily be interpreted as causing him to come within the liberal meaning of the terms of the exclusion clause. But can it be said that there is absolutely no doubt as to which sense was intended by the parties to the contract? This question, we think, must be answered in the negative.

We have found no case in Virginia or elsewhere, in which the precise language, with which we are here concerned, has been construed. We can only be guided by the general principles which have been promulgated as applicable to situations similar to this. In making the application, any attenuated theorizing must be avoided. The insurer cites the case of *Dickey* v. *General Accident Fire & Life Assurance Corporation, Ltd.,* 328 Pa. 541, 195 A. 875, which was decided by the Supreme Court of Pennsylvania on January 3rd, 1938, as typical of this case. There, however, the exclusion clause of the policy is perfectly plain. Chauffeurs

were excepted from coverage while engaged in any business or occupation of the insured or while engaged in the operation, maintenance or use of any automobile covered by the policy. At the time of the accident the plaintiff, the owner of the car, was driving it, having a short while before relieved the chauffeur. The latter was at the time riding in the tonneau of the car and was killed. The court apparently had no difficulty in determining that the chauffeur was excluded from coverage because it was patent that, even though he was not driving, he was in the general employ of the insured and was actually on duty at the time of his fatal injury. He was clearly within the plain terms of the exclusion.

The case of *State Farm Mutual, etc., Ins. Co.* v. *Justis,* 168 Va. 158, 190 S. E. 163, is an interesting and informing one dealing with a somewhat similar situation where the words of the exclusion clause were held to be ambiguous and their construction was in favor of the plaintiff who sued the insurer. It is the nearest Virginia case that we have found in point. It is interesting to note how full and inclusive are the text writers' definitions of the words "ambiguous" and "ambiguity." It is said of the former in Corpus Juris Secundum, vol. 3, page 1037: "The word has been defined as capable of being understood in more senses than one."

In the same work and same volume, page 1035, this is said of the word "ambiguity": "Words, language, or expressions which are capable of more senses than one, difficult to comprehend or distinguish, of doubtful import, of doubtful or uncertain nature, of doubtful purport, open to various interpretations, or wanting clearness or definiteness; in short, the effect of words that have either no definite sense or else a double one."

How aptly these definitions connect and tie up with the authorities hereinbefore cited. Of course, the authorities are not all one way. Their weight is with the tenor of this opinion.

In the record in the case in judgment there is filed an agreement among the parties to the effect that the amount to be adjudicated shall be limited to the named face value of the policy of insurance, which is $10,000.00, but this limitation is not to affect other and further rights of the parties as set forth in the agreement.

The insurer filed a motion to dismiss the writ of error granted by this court on the ground that the insured, Aronovitch, was not a party to the writ of error and that the order granting the writ did not make him a party to it. We think this motion is without merit. Aronovitch is before this court by counsel. In opposition to the motion he filed an affidavit that through his attorneys he paid the cost of the record in this case, the cost of printing the record and petition for writ of error and that he executed the supersedeas bond with his surety and that this was done with the full knowledge, consent and approval of Ayres, the plaintiff; that he, through his attorneys, had full notice and information of every step which was taken throughout the proceedings.

It has been said by this court, in the case of *Levine's Loan Office* v. *Starke,* 140 Va. 712, 125 S. E. 683, 684, that "garnishment is substantially a suit by the defendant in the name of the plaintiff against the garnishee." In this view the suit was, in reality, that of Aronovitch as the plaintiff. Notice to himself of his own doings, to be sure, would be vain. Again, the insurer will not be heard to urge as a benefit to it an incident, even if it existed, which was of no concern to it.

We think that the position of the insurer as to the application of the portion of the exclusion clause which is to the effect that it should not be liable under the policy for "any obligations assumed or imposed upon the assured by any workmen's agreement, plan, or law," is strained and without merit.

We quite agree with the statement in the reply brief of the plaintiff: "This exclusion was intended to cover liability under a workmen's compensation act such as we have

in Virginia, or any agreement or plan whereby an employer insures its employees against loss from injury, etc."

We reverse the judgment of the trial court and here enter a judgment for the plaintiff against the defendant, the insurer, in the sum of $10,000.00, with interest thereon from May 14, 1936.

*Reversed and final judgment.*

SPRATLEY, J., dissenting.

It seems to me that the conclusion in the majority opinion that the plaintiff in error was not engaged in operating or caring for the truck on which he was riding at the time of the accident is contrary to the actual facts. Such construction is based upon a liberal construction of the insurance contract in favor of the insured person, a construction so liberal that it disregards the plain words of the contract and the circumstances surrounding the employment of the plaintiff.

Nor do I see how any support for the conclusion can be gathered from the opinion in the case of *Aronovitch* v. *Ayres,* 169 Va. 308, 193 S. E. 524, wherein the employee recovered against his employer, the insured.

In the case under review, we are not concerned with the fellow-servant doctrine. The insurance contract presents no question between master and servant. It merely undertakes to protect and indemnify the insured under conditions specified, and excludes from coverage any employee of the insured while engaged in operating or caring for the automobile covered by the policy.

In *Aronovitch* v. *Ayres, supra,* we found that Ayres and Scruggs, who was the actual driver of the truck at the time of the accident, were, in fact, in some aspects of their service, fellow-operators; but we held that since the care of the truck was in terms put upon Scruggs alone, to whom Ayres was directed to report, the burden of seeing that the truck was kept in condition made Scruggs a vice-principal and not a fellow-employee.

Both Scruggs and Ayres had been employed to operate the truck by driving in shifts and to help to load and unload it. Their duties were to transport merchandise in the truck from certain cities to other cities. They were each paid on the basis of the number of miles traveled by the truck on these trips,—each at the rate of one cent per mile, and not upon the basis of the number of miles either one of them might drive, nor on the basis of the number of hours spent in conditioning the truck, nor for loading or unloading same. The presence of Ayres on the truck was as essential as that of the driver, and he was subject to call at any time to drive or to assist in making repairs, or to load or unload when necessary. Scruggs alone could not be expected to operate the truck for hundreds of miles without relief. It was a two-man truck and a two-man duty that was required to be performed.

Ayres was not a mere passenger, nor was he employed as a companion to entertain or amuse Scruggs to keep him from being lonely. Ayres was in the employ of the owner of the truck, the insured, while it was being driven by Scruggs, and received pay for the miles so traveled. He was engaged or employed to assist in its operation, and to promote the interest of his employer. The sole fact that he was not under the wheel at the time of the accident did not deprive him of the status in which his employer placed him at the time he was hired.

The effect of the majority opinion is to substitute in the insurance contract the word "driving" for the word "operating." "Operating" has a much broader meaning than "driving." While in the sense here used it includes "driving,"— "driving" does not include all instances of "operation." A performance of any function in the course of the operation of a truck, any exertion, or activity in connection therewith, makes one to that extent an operator or part operator thereof. One who accompanies another, who is driving, and holds himself in readiness, in accord with the terms of his contract, to relieve the driver upon necessary occasions is en-

gaged in "operating" the truck, even though he may not be at the same time the driver of the car.

Thus, while only one man may at one time drive a car, two or more men may be employed in the process of its operation,—one doing the actual driving, that is, controlling the motor and steering apparatus,—with both keeping a lookout on the road and both attending to its mechanical and engineering performance. The owner of a truck is liable for the negligent operation of his truck in his business where either of his two employees charged with the joint operation, fails to exercise necessary diligence to avert an avoidable injury, although the employee actually driving, by some peculiar circumstance, may have been prevented from observing the danger which was seen, or should have been seen by his companion in time to have taken steps for its avoidance, or was otherwise negligent. Liability for damages arises because an employee engaged in the course of the operation of the truck failed in his duty. We recognized such dual operation in *Yonker* v. *Williams,* 169 Va. 294, 192 S. E. 753, 754, where Mr. Justice Browning, speaking for this court, said:

"A Ford coupe owned and driven by William R. Yonker, the plaintiff in error, who will hereafter be referred to as Yonker, collided with the rear of a truck owned by E. Edwin Michael, which was in charge of and operated by Earl Spiker and his helper, Daniel G. Sager."

The truck was being operated. Ayres was an assistant in charge of its operation, and while it was being so operated he received the injuries complained of. The terms of the insurance contract make no distinction between the chief operator and an assistant operator. The risks of both are rated the same, and those risks are necessarily greater than those of a passenger or guest. By no stretch of the imagination can we term Ayres a guest or passenger. His status was beyond question that of an employee. As an employee, he was charged with the duty of operating and caring for the truck along with Scruggs. He was in the course of that employment when he was injured and the injury arose

out of his employment. He was traveling in the capacity of such employment at that time, and was being paid for the time thus occupied and the miles traveled, because it was necessary for him to be present and ready for the performance of his duties. The only period when he was not engaged in operating and caring for the truck during his period of employment was when he was off duty. The plain purpose of the exception in the contract is to exclude damages for injury to an employee under such circumstances.

The exclusion clause is one usually found in a standard form policy, and is not a mongrel clause. It should be read as a whole. It should not be interpreted as referring to conduct at a single moment. It relates to a course of conduct arising out of the course of employment. It makes a distinction between employees, whose duties are concerned with the operation and/or care of the truck and those employees or others of the public, who are not concerned with its operation and/or care. It can hardly have any other meaning. The conclusion in the majority opinion disregards its meaning and purpose.

EGGLESTON, J., concurs in this dissent.