370

## CIRCUIT COURT OF STAFFORD COUNTY

Glenwood Constr. Co., Inc.

v.

The Drees Co.,
Victor F. Rinaldi, Trustee, and
W. McCauley Arnold, Trustee

January 9, 1991

Case No. (Chancery) 781-90

By JUDGE JAMES W. HALEY, JR.

This case deals with the applicability of § 11-2.3, which permits a buyer to void contracts "for the sale of improved residential real estate which do not require completed performance within two years of the date of execution of the contract . . ."[1]

---

[1] Section 11-2.3 -- Voidability of contracts lacking certain provisions. Contracts made on and after July 1, 1977, for the sale of improved residential real estate which do not require completed performance within two years from the date of execution of the contract, shall be voidable at the option of the buyer unless such contract shall be (i) in such form as to be capable of being admitted to record under the provisions of Chapter 6 (Section 55-106 et seq.) of Title 55 of the Code of Virginia; (ii) made in duplicate and a copy capable of being admitted to record furnished to the buyer; and (iii) contain the following statement:

"This contract must be recorded in the general index of the clerk's office of the circuit court of . . . (city or county in which land is located) in order to protect the buyer from claims of subsequent purchasers of, or other persons obtaining an interest in, this real estate, or claims of judgment creditors, if

On July 13, 1989, Glenwood Construction Company, Inc. (Seller) and The Drees Company, a Kentucky corporation (Purchaser)[2] entered into a contract[3] which included the following:

> The Seller is the owner of fee simple title to 31,467 acres . . . [which the Seller] . . . intends to develop . . . [in Stafford County, Virginia] . . . .
>
> The Seller shall . . . promptly and diligently develop and improve the land into . . . [ultimately 88] . . . fully improved and finished building lots . . . .
>
> The Purchaser shall settle on nine (9) lots at the first settlement and thereafter the Purchaser shall be obligated to settle on a minimum of five (5) lots each month . . . .
>
> [F]irst settlement shall occur ten (10) days from the date on which Purchaser received written notification from the Seller's engineer that the base paving for the public street fronting the subject nine (9) lots has been installed according to plans and specifications . . . . [T]he first settlement shall occur on or before September 30, 1992 (amendment 9/18/89) . . . . The purchase price of the lots shall be Forty-two Thousand Five Hundred Dollars ($42,500.00) per lot . . . .

The Purchaser delivered two $100,000.00 deposits.

---

any, of the seller." The term "improved real estate" shall be deemed to include any land within a subdivision, a plat of which subdivision has been recorded pursuant to Article 7 (Section 15.1-465 et seq.) of Chapter 11 of Title 15.1 or prior statutory authority. (1977, c. 165; 1978, c. 476.)

[2] The contract was actually executed by the parties' predecessors in interest and assigned to the instant parties. That fact, however, has no relevance to the present litigation.

[3] Exhibit C to the Bill of Complaint filed herein.

> Both deposits . . . shall be secured by two (2) separate deeds of trust and notes on the Real Property. The Deeds of Trust and notes executed by the seller securing said deposits shall provide that the purchaser shall be entitled to a credit in the amount of $2,500.00 per lot . . . .

These two deeds of trust, each secured by property designated as the 31.467 acres, were executed by the Seller on October 31, 1989, and February 14, 1990, and recorded in Deed Book 706 at page 328[4] and Deed Book 722 at page 215.[5] The terms of each included the following:

> Grantor covenants (1) to pay the note according to the formula for settlement credit as provided therein or on demand in the event of failure to settle as agreed . . . .

In accordance with the contract by letter dated October 2, 1990,[6] Seller's engineer advised that "the base paving . . . has been completed . . . according to the approved plans and specifications." The Seller requested closing on October 8, 1990.

By letter dated October 2, 1990,[7] the Purchaser, after acknowledging receipt of the engineer's report and the request for closing, stated:

> According to the . . . contract, we are entitled to a ten-day period after receipt of the engineer's certificate to close. This, then, means that a closing date would occur on October 12, 1990, not October 8, 1990, as stated in your letter.

---

[4] Exhibit A to the Bill of Complaint filed herein.

[5] Exhibit B to the Bill of Complaint filed herein.

[6] Exhibit E to the Bill of Complaint filed herein.

[7] Exhibit F to the Bill of Complaint filed herein.

If there are any questions, please do not hesitate to call.

On October 9, 1990, the Seller recorded his approved plat for the entire subdivision of 88 lots in Plat Book 20, at pages 276-278.

On October 10, 1990,[8] Victor F. Rinaldi, Purchaser's attorney (who was also a trustee on each of the deeds of trust) by letter advised the Seller that:

> my client . . . has elected to exercise its statutory right under § 11-2.3 to avoid [the] contract.
> Demand is hereby made for the immediate return of . . . [the] $200,000.00 cash deposit.

When the Seller refused to return the $200,000.00 deposit and claimed the contract had been breached. Rinaldi by letter dated October 26, 1990,[9] wrote that he:

> as [the purchaser's] attorney and trustee . . . declare the notes in default . . . [and] enclose . . . a Notice of Trustees Sale on November 20, 1990, at 10:00 a.m. in front of the Stafford County Courthouse.[10]

After a hearing on November 20, 1990, at which all parties were present by counsel, this court enjoined the trustee's sale pending further argument on the matter on January 9, 1991, upon the Seller posting a bond, which condition has been met.[11]

The contract of July 13, 1989, did not contain the

---

[8] Exhibit H to the Bill of Complaint filed herein.

[9] Exhibit I to the Bill of Complaint filed herein.

[10] With the possible consequence, of course, that the purchaser could bid in the property for substantially less than he agreed to pay for it.

[11] This Decree is recorded in Chancery Order Book 37 at page 434.

statutory language for recordation and did not require completed performance within two years.

The statute here in question is applicable only to contracts for the sale of "improved" residential real estate.

In *Kricorian v. Chesapeake & Potomac Telephone Co.*, 217 Va. 284, 289, 227 S.E.2d 725, 728 (1976), the Supreme Court stated that:

> The term "improvement" is not a word of art having a fixed and *definite meaning*, but it must be interpreted and given the meaning indicated by its setting. (Emphasis supplied.)

*See also, Bowling v. Hawthorne Coal & Coke Co.*, 197 Va. 554, 569-570, 90 S.E.2d 159, 170 (1955); *Commonwealth v. Pocahontas Coal & Coke Co.*, 107 Va. 666, 667, 60 S.E. 84, 85 (1907). Such a setting includes its statutory context. *Brown v. Commonwealth*, 215 Va. 143, 147, 207 S.E.2d 833, 837 (1974); *Sellers v. Bles*, 198 Va. 49, 56, 92 S.E.2d 486, 490 (1956).

"Ambiguity exists where language admits of being understood in more than one way . . ." *Renner Plumbing v. Renner*, 225 Va. 508, 515, 303 S.E.2d 894, 893 (1983), quoted in *Lincoln Memorial Life Insurance v. Commonwealth Corrugated Container Corp.*, 229 Va. 132, 136-137, 327 S.E.2d 98, 101 (1985). Ambiguity further exists where a word, as is the case with "improved" as noted above, lacks "clearness and definiteness." *Brown v. Lukhard*, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985), citing *Aypec v. Harleysville Mutual Casualty Co.*, 172 Va. 383, 393, 2 S.E.2d 303, 307 (1939). *See also, Taylor v. Shaw and Cannon Co.*, 236 Va. 15, 19, 372 S.E.2d 128, 130-131 (1988).

In *Virginia Department of Labor and Industry v. Westmoreland Coal*, 233 Va. 97, 101-102, 353 S.E.2d 758, 762 (1987), the court stated that when a statute is ambiguous:

> [W]e, like the trial court, must resort to extrinsic evidence and the rules of construction to determine legislative intent, "the paramount object of statutory construction." *Vollin v. Arlington Co. Electoral Board*, 216 Va. 674, 678-79, 222 S.E.2d 793, 797 (1976).

Likewise, in *Virginia electric & Power Co. v. Board of Supervisors of Prince William County*, 226 Va. 382, 388, 309 S.E.2d 308, 311 (1983), the court stated:

> The purpose for which a statute is enacted is of primary importance in its interpretation or construction. *Norfolk So. Ry. Co. v. Lassiter*, 193 Va. 360, 364, 68 S.E.2d 641, 643 (1952).

In *Ambrogi v. Koontz*, 224 Va. 381, 386-387, 297 S.E.2d 660, 663 (1982), the court stated:

> When the proper construction of a law is not clear from the words of a statute, the legislative intent is to be "gathered from the occasion and necessity of the law ... the causes which moved the Legislature to enact it." *Vicars v. Sayler*, 111 Va. 307, 309, 68 S.E. 988, 989 (1910) (quoting *Fox's Adm'r v. Commonwealth*, 57 Va. [16 Gratt.] 1, 9 (1860)); see also *Richmond v. Sutherland*, 114 Va. 688, 691-93, 77 S.E. 470, 471-72 (1913). We turn, therefore, to the legislative history of the Act, as the events that prompted this legislation may illuminate the intent of the General Assembly in enacting the ... clause. See also, *Boyd v. Commonwealth*, 236 Va. 346, 349, 374 S.E.2d 301, 302 (1988).

The legislative history of § 11-2.3 is not without documentation. The *1976 Report of The Virginia Housing Study Commission*, House Del. Doc. No. 5 (1977), states as follows:

> **Contract Buying**
> There continues to be a problem in Virginia concerning the sale of homes on contract. This primarily affects families in the low and low-to-moderate income levels. As practiced, a buyer agrees under contract to make monthly payments on a house without receiving title to the property until the purchase price is paid. There are frequent cases in which the seller has terminated

the agreement fraudulently, or in a manner irrespective of the buyer's delicate financial situation. Subsequently, the property is resold, leaving the original contract buyer with a substantial investment and nothing to show for it. Although the sale of homes on contract is not illegal, there are few guidelines for the practice, and no legal recourse for either party in the event of fraud.

In order to increase protection for the buyer, therefore, the Commission recommends:

That legislation be enacted permitting recordation of contracts for the sale of improved residential property and requiring such contracts to contain language informing the purchaser of his option of recording such contract.

As a response to this Report, House Bill 1435 was introduced on January 14, 1977, and after several amendments approved as Chapter 165 of the 1977 *Acts of Assembly.* *See, H.J.,* 1977 Sess., pp. 107-108, 140, 422, 464, 488, 1101, 1103, 1138-1139, and 1230.

In 1978, the Legislature amended § 11-2.3 by adding: "The term 'improved real estate' shall . . . include any land within a subdivision, a plat of which subdivision has been recorded . . . ." Chapter 476, *Acts of Assembly, 1978.*

The broadest of the many contextual definitions given to the word "improvements" was that contained in *Eppes v. Eppes,* 181 Va. 970, 987-988, 27 S.E.2d 164, 172 (1943). There the court stated:

Mary Eppes originally owned the entire property, consisting of undeveloped and unimproved tracts of land. This property, in accordance with the contract between Mary, Josephine, and Richard Eppes, was subdivided into town lots, with streets, lanes, and alleys. Such improvements as were made to and upon the several subdivisions, as entireties, should not be eliminated because they were not actually made upon specifically identified lots or parcels of land included in a subdivision.

The word "improvement" is a comprehensive term, which includes in its meaning any development whereunder work is done and money expended with reference to the future benefit or enrichment of the premises. *Cullop v. Leonard*, 97 Va. 256, 33 S.E. 611; 20 Words and Phrases, Perm. Ed., p. 313.

No special emphasis should be placed on the word "upon." In a broad and liberal sense, the clause in which it is used includes permanent improvements made to or for the benefit of the property as a whole as well as those on specific premises. The inquiries did not limit the nature of the improvements to buildings and structures physically located upon the lots as distinguished from the tracts of land, or the easements or appurtenances appertaining thereto. Any improvements on, in, or under the streets or easements for the betterment, use, and enjoyment of the lots separately, or the property as a whole, constituted the character of improvements contemplated by the court.

It is true that the inquiries do not specifically refer to lots never sold. The improvements claimed, however, inured as well to the benefit of all the lands, sold or unsold. The improvement of the streets and the construction of curbs and gutters thereon were essential to the development and sale of abutting lots.

In *Keister's Adm'r v. Keister's Ex'rs*, 123 Va. 157, 162, 96 S.E. 315, 317 (1918), the court stated:

Now, with respect to the construction of statutes in derogation of the common law, there are certain well-settled rules which have been so long and so well established that we need but to refer to them. Among those rules is the following: The Legislature is presumed to have known and to have had the common law in mind in the enactment of the statute; and the statute will be construed to read as if the common law remained unchanged (that is to

say, the statute will be read along with the provisions of the common law, and the latter will be read into the statute), unless the purpose of the statute to change the common law appears from the express language of it or by necessary implication from such language.

In light of the foregoing, this court concludes that the Legislature was aware of the broad definition given to improvements in *Eppes v. Eppes, supra,* and in accordance therewith amended § 11-2.3 to expand the applicability of the statute to include as a minimal "improvement" the act of subdividing and recording a plat.

All real estate is capable of being improved. But real estate cannot be residential without improvement. Accordingly, the legislature had to mean that § 11-2.3 applied only to real estate that had been in some manner *improved for residential use,* even if only at a minimum by subdividing and recording, *at the time the contract was signed.* When the contract underlying this action was signed on July 13, 1989, the Seller here, like Mary Eppes, owned 31.467 acres "consisting of undeveloped and unimproved . . . land.[12]

The Legislative history of § 11-2.3 shows that it was enacted to protect from fraud purchasers of "homes on contract,"[13] and thence by amendment similar purchasers of lots included in a recorded subdivision plat.[14]

The Purchaser in the instant case committed himself by contract to potentially buy finished lots in a total

---

[12] Eppes v. Eppes, supra.

[13] See, 1976 Report of the Virginia Housing Study Commission, supra.

[14] Frank v. Tipco Homes, Inc., 19 Va. Cir. 291 (1990), dealt with a "contract to buy a lot on which (Tipco) was to build a house."

Bell v. Burleigh, Norfolk Circuit Court, The Honorable Thomas McNamara (Virginia Law Weekly, 90-H-489, December 17, 1990) dealt with the sale of an existing house within a subdivision.

amount of almost $4 million.[15] Such a buyer is not within that class for which the Legislature sought protection by the enactment of § 11-2.3.

As noted above, the Purchaser here by letter dated October 2, 1990, advised the Seller that the first closing "would occur on October 12, 1990,"[16] and then repudiated the contract on October 10, 1990. Such action constitutes sharp-dealing with indices of fraud. § 11-2.3 was designed to prevent fraud, not to promote it.

It is the opinion of this court that § 11-2.3 is not applicable to contracts for the sale of real estate that is unimproved at the time the contract was signed, and, further, that the Purchaser in this cause does not fall within the class of those afforded protection by Section 11-2.3.

Finally, with respect to the Deeds of Trust quoted above, it was the maker-"Grantor"-Seller alone who executed them and covenanted to pay by following the settlement formula "or on demand in the event of failure to settle as agreed." This quoted language can have no reasonable meaning except as *imposing a duty upon the Seller*. It cannot be reasonably construed as *granting a right to the payee-purchaser* to refuse to settle at its option. Therefore, even if § 11-2.3 were applicable, there being no evidence whatsoever of the Seller's failure to settle, the notes and Deeds of Trust are not in default, and the Buyer is precluded from the remedy, if he is entitled to one, by either default on the notes or foreclosure.

The July 13, 1989, contract between the parties included the following:

> Should the Purchaser refuse to settle on said lots and the Seller is ready, willing and able to perform, this Agreement shall be declared null and void, and both parties shall be relieved of any further obligations hereunder, and the

---

[15] As noted above, the "plat of which subdivision has been recorded," as set forth in Section 11-2.3, was only recorded in this case on October 9, 1990, only one day before the buyer repudiated the contract.

[16] Exhibit F to the Bill of Complaint filed herein.

380

Deposits previously paid by the Purchaser shall be retained by the Seller as liquidated damages.

The court finds that the Seller was ready, willing and able to perform, and the Purchaser has refused to settle.

Accordingly,

(1) the $200,000.00 deposit is forfeited to the Sellers as liquidated damages, and

(2) the notes and the Deeds of Trust recorded at Deed Book 706, Page 328, and Deed Book 722, Page 215, are declared null and void, and the Clerk is directed to marginally so note on the same, and

(3) the Purchaser is permanently enjoined from foreclosing on the Deeds of Trust aforesaid, and

(4) the contract of July 13, 1989, is declared null and void, and

(5) the Purchaser's Motion for Summary Judgment is denied, and judgment is granted in favor of the defendants upon Purchaser's Counterclaim and Cross-Bill, and

(6) Seller is granted his costs and reasonable attorneys fees in an amount which shall be determined at a hearing upon due notice of the same, and

(7) the bond executed by the Seller as a condition of the enjoining of the Trustee's sale is released.