Guy J. CARRIER, Plaintiff,

v.

RLI INSURANCE COMPANY, Defendant.

No. CV 208–155.

United States District Court, S.D. Georgia, Brunswick Division.

Oct. 18, 2010.

David B. Marvel, Prenner, Marvel, PA, Charleston, SC, for Plaintiff.

James F. Moseley, Jr., Phillip A. Buhler, Moseley, Prichard, Parrish, Knight & Jones, Jacksonville, FL, for Defendant.

### ORDER

LISA GODBEY WOOD, Chief Judge.

Presently before the Court are Defendant RLI Insurance Company's Motion for Summary Judgment and Plaintiff Guy J. Carrier's Motion for Partial Summary Judgment. Upon due consideration, De-fendant's Motion for Summary Judgment is **GRANTED,** and Plaintiff's Motion for Partial Summary Judgment is **DENIED.**

## BACKGROUND

### A. Facts

Plaintiff Guy J. Carrier and his wife purchased a fifty-foot Aventure Power Catamaran (the "Vessel") on or about May 17, 2008, from the manufacturers of the Vessel, Tim Jordaan and Aventure Cata-marans, Limited. Plaintiff also purchased an insurance policy (the "Policy") for the Vessel from Defendant RLI Insurance Company. As Plaintiff sailed the Vessel on her maiden voyage on the morning of May 20, 2008, the Vessel began taking on water and sank. Plaintiff filed a claim with De-fendant under the Policy shortly thereaf-ter.

Plaintiff and Defendant each sent sur-veyors to inspect the Vessel following the sinking. Defendant's surveyor concluded that the Vessel had sunk because the man-ufacturers of the Vessel had improperly installed an escape hatch on the hull of the Vessel. *See* Def.'s Mot. Summ. J. 6–7. Plaintiff's surveyor agreed that the defec-tive escape hatch caused the sinking and concluded that Jordaan and Aventure Cat-amarans had improperly manufactured the hatch. *See* Pl.'s Mot. Part. Summ. J. 6.

After the inspections, Defendant in-formed Plaintiff that it would deny Plain-tiff's insurance claim arising from the Ves-sel's sinking. Plaintiff filed this lawsuit on November 20, 2008, alleging that Defen-dant breached the terms of the Policy. The parties filed the cross-motions for summary judgment currently under review on January 22, 2010.

### B. The Policy

The Policy purports to cover losses re-sulting from (1) damage to the Vessel's hull, machinery, and equipment; (2) dam-

age to the trailer or cradle used for the storage and/or transportation of the Vessel; (3) damage to a tender, a small boat "used primarily to service and maintain the Vessel"; (4) costs associated with towing the Vessel where the Vessel has become disabled; and (5) damage to personal effects onboard the Vessel. *See* Compl. Ex A. Recovery for such losses, however, is subject to a number of exclusions, three of which are relevant here. The Policy's section on Exclusions states:

"We" will not pay ... for loss or damage caused by or resulting from any of the following, regardless of whether any other cause or event contributed concurrently or in any sequence:

. . .

2. Inherent vice, manufacturer's defects or defects in design;

3. Resulting from faulty workmanship or damage during installations, upgrades or repairs; ...

4. The cost of replacing or repairing any item having a "Latent Defect" that causes damage to 'your' insured property; however, resulting damage would be covered;

## APPLICABLE LAN

### A. Standard for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and draw all inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. The burden then shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but must come forward with "specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e)(2).

### B. Governing Law

■ The Policy states, and the parties do not dispute, that United States maritime law governs the Policy. *See* Compl. Ex. A. Under federal maritime law, state law governs maritime contracts in the absence of a controlling federal rule. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 322–24, 75 S.Ct. 368, 99 L.Ed. 337 (1955). Given the paucity of federal rules governing maritime contracts, "the application of the *Wilburn Boat* doctrine means that marine insurance in the United States will be dominated by state law rules." 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 19–6 (4th ed.).

■ In determining which state's law governs, courts look to the "state in which the policy was formed" or "the state in which the policy was issued and delivered." *Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 890–91 (5th Cir.1991). Between those states, the "law of the state with the greatest interest" applies. *Id.* The parties in the present case agree that the law of New York—where the Policy was formed—or the law of Virginia—where the Policy was

issued and delivered—should apply. *See* Pl.'s Mot. Part. Summ. J. 12. The parties further agree that the laws of New York and Virginia do not differ in a way that necessitates a determination of which state's law applies. *See* Pl.'s Mot. Part. Summ. J. 13. The Court has discovered no difference in Virginia and New York law as applied to this case and will therefore rely on the laws of both New York and Virginia.

## DISCUSSION

### A. Plaintiff's Coverage Under the Policy

Defendant's Motion for Summary Judgment argues that the loss of the Vessel resulted from a defective hatch manufactured, designed, and installed by the Vessel's manufacturer. *See* Def.'s Mot. Summ. J. 13. Because the Policy contains exclusions for losses arising out of "manufacturer's defects or defects in design" and "faulty workmanship or damage during installations," Defendant argues that the Policy does not cover Plaintiff's claim as a matter of law. *Id.*

Plaintiff, on the other hand, characterizes the defective hatch as a "latent defect," such that the "latent defect" exclusion controls the claim. *See* Pl.'s Mot. Summ. J. 14–19. The "latent defect exclusion" provides that the Policy does not cover the cost of replacing or repairing an item having a latent defect. Compl. Ex. A. It also creates an exception to the exclusion, however, in stating that the Policy does cover "resulting damage" from a latent defect. *Id.* Plaintiff argues that his claim falls under the "resulting damage" exception to the "latent defect" exclusion, such that the Policy covers the claim, irrespective of the Policy's other exclusions, or at least creates an ambiguity that should be resolved in his favor. Pl.'s Mot. Part. Summ. J. 19.

The questions for the Court, then, are the following: (1) Does Plaintiff's claim—resulting from the Vessel's defective hatch—fall under the Policy's "manufacturing defect" or "faulty workmanship and installation" exclusions? (2) If Plaintiff's claim falls under an exclusion, does the "resulting damage" exception to the "latent defect" exclusion restore coverage notwithstanding the Policy's other exclusions, or at least create an ambiguity in the terms of the Policy that should be resolved in favor of Plaintiff?

### 2. *Exclusions*

█ Defendant argues that Plaintiff's claim falls under the "manufacturer's defect or defect in design" exclusion and/or the "faulty workmanship or damage during installations" exclusions. *See* Def's Mot. Summ. J. 20–22. While the parties dispute the precise nature of the defective hatch and whether the "faulty workmanship or damage during installations" exclusion applies, those disagreements ultimately have no bearing on the case because the "manufacturer's defect or defect in design" exclusion clearly applies.

█ The Eleventh Circuit defines the term "manufacturer's defect" in a maritime insurance policy as a "defect [ ] attributable to the manufacturer whether in the manufacturer's design or manufacturing of the product." *St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.,* 561 F.3d 1181, 1191 (11th Cir.2009). Plaintiff acknowledges that the "hatch was specifically manufactured for [the] [V]essel by Tim Jordaan of Aventure Catamarans." Pl.'s Resp. to Def.'s Mot. Summ. J. 12. Moreover, Plaintiff concedes that the "manufacturer's defect" exclusion "is very broad and includes all type of manufacturing and design defects." *Id.* Finally, while he argues that the defective hatch is properly characterized as a "latent defect,"

Plaintiff acknowledges that the defective hatch could be both a "manufacturer's defect" and a "latent defect." *Id.* Thus, the parties do not dispute that the defective hatch is a "manufacturer's defect." As a result, the Court finds that regardless of whether the "faulty workmanship and installation" exclusion applies, Plaintiff's claim falls under the "manufacturer's defect" exclusion.

### 2. Restoration of Coverage

■ Plaintiff argues that regardless of whether his claim falls under an exclusion, the Policy's "resulting damages" exception to the "latent defects" exclusion establishes coverage, or at least creates an ambiguity that should be resolved in his favor. Pl.'s Resp. to Def.'s Mot. Summ. J. 13. The law, however, does not support Plaintiff's position.

In *Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 405 A.2d 788, 794 (1979), the New Jersey Supreme Court considered the validity of an insurance claim that fell under both (1) an exclusion that ostensibly precluded recovery under the policy; and (2) an exception to a separate exclusion that allegedly restored coverage. The court held that the policy precluded the claim and that the policy was not ambiguous. *Id.* In doing so, the court cited "the basic principle that exclusion clauses [s]ubtract from coverage rather than grant it." *Id.* The court further explained:

> [E]ach exclusion is meant to be read with the insuring agreement. The exclusions should be read seriatim, not cumulatively. If any one exclusion applies there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions.

*Id.* The rule cited in *Weedo* is well-established in New York law. In *Hartford Accident & Indem. Co. v. A.P. Reale & Sons,*

*Inc.,* 228 A.D.2d 935, 644 N.Y.S.2d 442 (N.Y.App.Div.1996), a New York appellate court found that an insurance policy was not ambiguous, even though the insured alleged that its claim fell under two conflicting policy exclusions. The court held, "this apparent contradiction is negated by the application of the principle that policy exclusions are to be read seriatim and, if any one exclusion applies, there is no coverage since no one exclusion can be regarded as inconsistent with another." *Id.* at 935, 644 N.Y.S.2d 442; *see also Monteleone v. Crow Constr. Co. et al.,* 242 A.D.2d 135, 140–41, 673 N.Y.S.2d 408 (N.Y.App. Div.1998) ("[E]xclusions in policies of insurance must be read seriatim, not cumulatively, and if any one exclusion applies there can be no coverage since no one exclusion can be regarded as inconsistent with another." (quoting *Zandri Constr. Co. v. Firemen's Insur. Co. of Newark,* 81 A.D.2d 106, 109, 440 N.Y.S.2d 353 (N.Y.App.Div.1981))).

Although neither party cites a Virginia case directly on point, the Virginia Supreme Court cited the *Weedo* rule with approval in *Nationwide Mut. Ins. Co. v. Wenger,* 222 Va. 263, 278 S.E.2d 874, 876 (1981). In *Wenger,* an insurance policyholder argued that the exclusions in its policy were "vague, ambiguous and uncertain." *Id.* at 875. The policyholder further argued that since insurance policies are "to be construed liberally in favor of the insured and strictly against the insurer," the ambiguous exclusions did not apply to its claim. *Id.* In rejecting the policyholder's arguments, the court relied heavily on *Weedo,* quoting virtually identical language:

> Exclusion (a) does not extend or grant coverage. To the contrary it is a limitation or restriction on the insuring clause ... The exception remains subject to

and limited by all other related exclusions contained in the policy.

*Id.* at 876 (quoting *Haugan v. Home Indem. Co.,* 86 S.D. 406, 197 N.W.2d 18, 22 (1972)).

Under the rule articulated in *Weedo,* which New York courts have adopted and the Virginia Supreme Court has approved, the Policy in the present case clearly does not cover Plaintiff's loss. The rule provides that the "manufacturer's defect" exclusion should be read independently of the "latent defect" exclusion. As a result, the "manufacturer's defect" exclusion is unmodified by the "resulting damages" exception to the "latent defect" exclusion. Because the defective hatch falls under the "manufacturer's defect" exclusion, the Policy does not cover Plaintiff's losses, irrespective of the "latent defect" exclusion.

Plaintiff offers two objections to the application of the *Weedo* line of cases. First, Plaintiff notes that the *Weedo* cases all involve "typical" commercial general liability insurance policies. Pl.'s Resp. to Def.'s Mot. Summ. J. 7. Although his observation is accurate, Plaintiff offers no legal or logical reason why the *Weedo* rule should not apply in the present context. Second, Plaintiff notes that the *Weedo* line of cases do not explicitly state that an exception to an exclusion in an insurance policy can "never" establish coverage. *Id.* at 8. Again, Plaintiff's observation is accurate. Nonetheless, that the *Weedo* line of cases does not explicitly foreclose the possibility of an exception to an exclusion establishing coverage does not undermine the application of the rule in this case. The cases clearly affirm that exclusions in insurance policies are not subject to, or modified by, exceptions to other exclusions.

Plaintiff also notes that the Eleventh Circuit recently found in favor of an insurance policyholder, where the issuer of the policy denied coverage under a "manufac-turer's defect" exclusion. *See French Cuff, Ltd. v. Markel Am. Ins. Co.,* 322 Fed.Appx. 669, 670 (11th Cir.2009). Again, Plaintiff's observation is accurate but ineffectual. In *French Cuff,* the court held that an exception for "latent defects" in a "manufacturer's defects or defects in design" exclusion provided coverage for losses resulting from a latent defect in the policyholder's boat. *Id.* at 672. *French Cuff,* however, is distinguishable from the present case in two crucial ways. First, the Eleventh Circuit applied Florida law, not New York or Virginia law, in interpreting the insurance policy. *Id.* Second, in *French Cuff,* the "manufacturer's defects or defects in design" exclusion and the "latent defects" exception were part of the same insurance policy provision. The exception was "in a paragraph immediately beneath, and indented from [the manufacturer's defects or defects in design] exclusion" and stated, "this exclusion does not apply to loss, damage or expense directly caused by … any latent defect in the hull." *Id.* at 672. The exception in *French Cuff* clearly modified the exclusion because it was not only part of the exclusion itself, but also explicitly stated that its purpose was to modify the exclusion. In contrast, the present case involves two separate exclusions, not a single provision. Thus, whereas the Eleventh Circuit in *French Cuff* considered whether an exception to an exclusion modified that very exclusion, the Court here must consider whether an exception to one exclusion modifies a completely separate exclusion. Because *French Cuff* addressed a fundamentally different question, it does not support Plaintiff's position.

Finally, Plaintiff urges the Court to adopt what he claims is an alternative "doctrine." Pl.'s Resp. to Def.'s M. Summ. J. 8. Reiterating the general principle that an ambiguity in an insurance policy should

be construed in favor of the insured, Plaintiff argues that the Court should determine if an ambiguity exists based on whether "a reasonable person could believe that certain occurrences were covered by the insurance policy, notwithstanding that the insurance company intended and considered them to be excluded." *Id.* By casting the "reasonable person" standard as an alternative to the *Weedo* rule, Plaintiff simply misconstrues the law. *Weedo* and its progeny affirm that a general exclusion precludes coverage, regardless of an exception to another exclusion, precisely because such provisions do not create a "genuine ambiguity" that would confuse "the average policy holder." *See Weedo* 405 A.2d at 794. *Weedo* does not reject the "reasonable person" standard. Rather, it merely holds that exceptions to exclusions generally do not give rise to a "genuine ambiguity."

Were a "reasonable person" standard— independent of *Weedo*—to apply, Plaintiff's argument would nonetheless be unavailing. In support of the "reasonable person" standard, Plaintiff cites *UnitedHealth Grp., Inc. v. Columbia Cas. Co.*, No. 05–CV–1289, 2010 WL 317521 (D.Minn. Jan. 19, 2010). In *UnitedHealth*, the court considered whether an exception to an exclusion modified or trumped a separate exclusion in an insurance policy. The court first noted that it would be "odd [ ] to bury an affirmative grant of coverage in the middle of a list of exclusions." *Id.* at *4. Turning to the exception to the exclusion itself, the court stated that "[b]eginning the clause with 'however' strongly suggests that it is meant to narrow the exclusion that appears in the preceding clause," as opposed to modify any other exclusion. *Id.* Finally, recognizing that the policy would be ambiguous if the exclusion in question completely eliminated the coverage granted by the exception, the court found that there was no ambiguity because

exclusion only applied to a "subset of claims" that would be restored by the exception to the other exclusion. *Id.* at *6.

Applying the logic of *UnitedHealth* to the present case leads to the same conclusion: the Policy is not ambiguous. It is indeed "odd," as the *UnitedHealth* court noted in that case, that Plaintiff here relies on a provision listed in the "Exclusions" section of the policy as the primary indication of coverage. Moreover, that the exception to the "latent defects" exclusion begins with "however," preceded by a semicolon, suggests that the purpose of the exception is to modify, indeed narrow, the "latent defects" exclusion, not any other exclusion. *See* Compl. Ex. A.

Finally, there is no ambiguity arising from a conflict between the provisions, to the extent that the "manufacturer's defects" exclusion does not completely nullify the exception to the "latent defect" exclusion. Defendant, in response to an inquiry from the Court, provides examples of defects that it claims fall under the exception to the "latent defects" exclusion but not under the "manufacturer's defect" or "inherent vice" exclusions. Dkt. No. 42. Defendant's examples allegedly constitute "failures of [a vessel's] component parts or materials" that are not attributable to the manufacturer of the vessel itself: material defects in metal, defects in the internal components of a battery, defects within integral fuel tanks, defects within fuel injectors, defects within the composition of an exhaust hose, defects within the steering cable, and internal defects in an electrical wiring system. *Id.* at 3.

Plaintiff, in response, argues that each one of the examples is a "manufacturer's defect" or "inherent vice." Dkt. No. 43. Plaintiff interprets the "manufacturer's defect" exclusion broadly, arguing that any defect attributable to any manufacturer—

not just the manufacturer of the Vessel—triggers the exclusion. *Id.* at 3. Plaintiff claims that the Eleventh Circuit in *Lago Canyon* defined "manufacturer's defect" to "encompass [ ] all defects in design and defects in manufacturing or construction," such that "any defect for which a manufacturer may ultimately be liable is a manufacturer's defect." *Id.*

Plaintiff's reliance on *Lago Canyon,* however, is misplaced. In *Lago Canyon,* a policyholder claimed that its policy's "manufacturer's defect" provision covered damages to a vessel resulting from the corrosion of a brass hose barb. 561 F.3d at 1185. The policyholder argued that the manufacturer's decision to incorporate the brass hose barb, which was vulnerable to corrosion, constituted a "manufacturer's defect." *Id.* The Eleventh Circuit, noting the lack of cases defining the term "manufacturer's defect," agreed with the policyholder and held that "manufacturer's defect" included "defects attributable to the manufacturer whether in the manufacturer's design or manufacturing of the product." *Id.* at 1191. The identity of the manufacturer was not an issue in the case. *See id.* The parties did not raise at trial or on appeal, and the court did not consider, the novel argument that "manufacturer's defect" could include a defect attributable to the manufacturer of the hose barb. Indeed, the only manufacturer the Eleventh Circuit contemplated in *Lago Canyon* was the manufacturer of the boat itself.

While mindful of the general rule that ambiguous provisions in an insurance policy are construed against the insurer, *see Ayres v. Harleysville Mut. Cas. Co.,* 172 Va. 383, 2 S.E.2d 303, 304 (1939), the Court finds that "manufacturer's defect" presents no genuine ambiguity as to which manufacturer the Policy refers. The "manufacturer's defect" exclusion covers defects attributable to the manufacturer of the insured property—in this case, the Vessel—itself. Under Plaintiff's reading of the Policy, "manufacturer's defect" would include defects attributable to any one of the plethora of manufacturers that produced any component of the Vessel, as well as the myriad of manufacturers that produced any one of the components of those components, and so on. Plaintiff's interpretation of "manufacturer" is thus unreasonable and untenable.

Because "manufacturer's defect" refers to defects attributable to the manufacturer of the Vessel, Defendant provides viable examples of "latent defects" that do not constitute "manufacturer's defects." Dkt. No. 42. A defect in an internal component of a battery from a third-party manufacturer, for example, that causes damage to the Vessel could be a "latent defect" that is not also a "manufacturer's defect." *Id.* The Court thus finds that the "manufacturer's defect" exclusion does not completely nullify the exception to the "latent defect" exclusion.

The "inherent vice" exclusion, which is listed in the Policy as part of the "manufacturer's defect" exclusion, also does not completely nullify the "latent defect" exception. The Policy states, " 'Latent Defect' means a flaw in the material which is existing at the time of the building of the "vessel" or its machinery, and which is not discoverable by the 'Insured' through ordinary methods of testing." Compl. Ex. A. Although the Policy does not define "inherent vice," the parties both cite the definition provided in *Archer–Daniels Midland Co. v. Phoenix Assurance Co.,* 975 F.Supp. 1129, 1136 (S.D.Ill.1997): "inherent vice" means "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time."

The key difference between the terms is that while a "latent defect" exists only

where material is flawed or otherwise defective, an "inherent vice" may be present due solely to the "inherent nature" of the material, even in the absence of some sort of independent flaw or defect. Thus, in *J. Aron & Co. v. Cargill Marine Terminal, Inc.*, the court found that a policy insuring a shipment of grain, which the court treated as containing an "inherent vice" exclusion, barred coverage, where "the inherent nature of grain caused it to deteriorate with the lapse of time," even in the absence of a flaw or defect in the grain itself. 998 F.Supp. 700, 703 (E.D.La.1998). Because "inherent vice" and "latent defect," as defined in the Policy, may refer to distinct conditions, the "inherent vice" exclusion does not completely nullify the exception to the "latent defect" exclusion.

Plaintiff's only argument to the contrary is the vague proposition that some "courts have construed [inherent vice] as analogous to latent defects." Dkt. No. 43. As an initial matter, it is of no legal consequence if "inherent vice" and "latent defect" are analogous—the issue is whether the Policy's "inherent vice" exclusion completely eliminates the "resulting damages" exception to the "latent defect" exclusion. Nonetheless, in support of his position, Plaintiff provides several quotations from cases that define "inherent vice" with no reference whatsoever to latent defects. *See id.* Plaintiff's most relevant case is *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Wausau Paper Mills Co.*, 818 F.2d 591, 595 (7th Cir.1987), in which the court states that inherent vice and latent defects are "physical conditions . . . that existed in the property from the date of manufacture." The Seventh Circuit, however, neither states nor implies that inherent vice and latent defects are identical or interchangeable concepts.

The Court, therefore, finds that the Policy's exclusions do not nullify the exception

to the "latent defect" exclusion. Neither the *Weedo* rule that New York and Virginia have approved, nor *UnitedHealth's* analysis that Plaintiff advocates, provides support for Plaintiff's position that the Policy is ambiguous. Because the Policy clearly excludes coverage for damages arising from "manufacturer's defects," Plaintiff's claim fails as a matter of law. Moreover, despite Plaintiff's vigorous arguments, the question of whether the Vessel's defective hatch constitutes a "latent defect" is moot, given that the "manufacturer's defects" exclusion applies irrespective of the "latent defect" exclusion.

### B. Applicability of Mortgagee Clause

█ Plaintiff argues that even if the Policy does not cover his claim, the Policy's "Mortgagee Clause" covers CGI Finance, which loaned Plaintiff money to purchase the Vessel. The Mortgagee Clause states the following:

> If a Loss Payee named on the Declarations or by endorsement is identified as a Mortgagee their rights shall not be affected in any way by any act by "you," including without limitations improper or negligent acts or omissions, or by any failure to comply with any warranty or condition over which they have no control.

Compl. Ex. A. Plaintiff claims that the Mortgagee Clause covers CGI because the clause states that CGI's rights are unaffected by a "condition over which they have no control"—in this case, a "manufacturer's defect." Pl.'s Mot. Part. Summ. J. 21.

Plaintiff argues that the phrase "including without limitations improper or negligent acts or omissions" modifies only the immediately preceding clause. *Id.* at 23. For the sake of interpretive clarity, Plaintiff argues that the Mortgagee Clause should be read without the "including"

phrase. *Id.* Accepting Plaintiff's argument, the clause without the "including" phrase would state the following: CGI's "rights shall not be affected in any way by any act by 'you,' or by any failure to comply with any warranty or condition over which they have no control."

Without citing any legal authority or explaining his logic, Plaintiff argues that the phrase "or by any failure to comply with any warranty or condition over which they have control" is actually two separate phrases that each constitute part of a series. *Id.* Plaintiff thus interprets the clause as stating, CGI's rights "s hall not be affected by (1) any act by the insured, (2) failure to comply with any warranty, or (3) condition over which the mortgagee has no control." *Id.* Plaintiff's only argument is that under this reading of the Mortgagee Clause, the "manufacturer's defect" that gave rise to Plaintiff's claim was a condition over which CGI had no control. *Id.* at 23.

Plaintiff's strained interpretation is at odds with the plain reading of the clause. The clause uses the words "by any" two times, denoting two parallel conditions that do not affect the mortgagee's rights. *See* Compl. Ex. A. The phrase is most logically read as stating, CGI's "rights shall not be affected in any way (1) *by any* act by 'you' ... or (2) *by any* failure to comply with any warrant or condition over which they have no control." Plaintiff's reading, which splits the second condition and thereby creates a third, would retain its parallel structure only if "by any" preceded the third condition. Plaintiff, in effect, asks the Court to insert an additional "by any," such that the clause reads, CGI's "rights shall not be affected in any way by any act by 'you,' by any failure to comply with any warrant or *by any* condition over

which they have no control." Because the plain language of the policy governs in the absence of ambiguity, the Court declines to read an additional "by any" into the clause. *See P.J.P. Mech. Corp. v. Commerce and Indus. Ins. Co.*, 65 A.D.3d 195, 198, 882 N.Y.S.2d 34 (N.Y.App.Div.2009) ("[T]he unambiguous provisions of the policy must be given their plain and ordinary meaning.").

Plaintiff's argument is further weakened by the absence of a serial comma preceding the "or condition over which they have no control" phrase. *See Omaha Healthcare Ctr. v. Johnson,* 246 S.W.3d 278, 283 (Tex.Ct.App.2008) (noting that a comma should precede a conjunction in a series for the sake of clarity, although the rule is not universally followed).

Because Plaintiff's interpretation of the Mortgagee Clause is at odds with the plain reading of the provision and Plaintiff offers no legal or logical reason to depart from the plain reading, the Court finds that the Mortgagee Clause merely provides that CGI's rights are unaffected (1) by any act of the insured; or (2) by any failure to comply with any warranty or condition over which they have no control.[1] Plaintiff's argument that the manufacturer's defect was a physical condition over which CGI had no control, such that CGI is entitled to payment under the Mortgagee Clause, is thus unavailing.

**Conclusion**

For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment is **DENIED.** Defendant's Motion for Summary Judgment is **GRANTED.**

---

1. Plaintiff concedes that "any failure" refers to any failure on the part of the insured. Pl.'s

Mot. Part. Summ. J. 23.